**Robert Alton HARRIS, Petitioner,**

v.

**R. PULLEY, Warden of the California State Prison at San Quentin, Respondent.**

No. 82–5246.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 11, 1982.

Decided Sept. 16, 1982.

As Amended on Denial of Rehearing and Rehearing En Banc Nov. 15, 1982.

Certiorari Granted March 21, 1983. See 103 S.Ct. 1425.

Certiorari Denied March 21, 1983. See 103 S.Ct. 1450.

Michael J. McCabe, Savitz & McCabe, San Diego, Cal., for petitioner.

Charles M. Sevilla, Public Defender, San Diego, Cal., amicus curiae.

Michael D. Wellington, Deputy Atty. Gen., San Diego, Cal., for respondent.

Appeal from the United States District Court for the Southern District of California.

Before CHOY, ANDERSON and CANBY, Circuit Judges.

PER CURIAM:

Robert Harris, a California state prisoner who was sentenced to death for the murder of two teenage boys, appeals from the district court's denial of his habeas corpus petition brought under 28 U.S.C. § 2254. Because the California Supreme Court did not undertake a proportionality review of the application of the death penalty in this case, we vacate the district court's denial of the petition and instruct the district court to grant the petition relieving petitioner from his sentence of death unless the California Supreme Court undertakes, within a reasonable time not to exceed 120 days from the date this order is filed, the proportionality review announced in *People v. Frierson*, 25 Cal.3d 142, 183, 158 Cal.Rptr. 281, 599 P.2d 587 (1979) (plurality opinion), and *People v. Jackson*, 28 Cal.3d 264, 312, 168 Cal.Rptr. 603, 618 P.2d 149 (1981). If it becomes necessary, the district court should examine the California Supreme Court's proportionality decision to make certain that it is consistent with *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), and *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). To facilitate the district court's consideration of the numerous other issues Harris has raised, if such is necessary, we also review his other contentions.

I. *The Constitutionality of the California Death Penalty Statute*

California has established by statute an elaborate procedural mechanism for the im-

position of the death penalty. If a jury convicted the defendant of first degree murder, the same jury must also generally determine whether the special circumstances are true, Cal. Penal Code § 190.4 (Deering 1977),[1] and, if necessary, the penalty. *Id.* § 190.3. Even if the trial judge acted as the fact finder, a jury must determine the special circumstances unless the defendant and the people waive this right. *Id.* at § 190.4. Once the defendant has been found guilty of first degree murder, the procedure is divided into the special-circumstances stage and the sentencing stage. *See People v. Superior Court*, 31 Cal.3d 797, 803, 183 Cal.Rptr. 800, 647 P.2d 76 (1982). First, the jury must determine the truth of any special circumstances the prosecution has charged. Cal. Penal Code § 190.1(b). The jury cannot impose the death penalty unless it first finds at least one statutorily specified special circumstance to be true beyond a reasonable doubt. *Id.* If it finds the special circumstance true, the jury must then move to the sentencing stage: reviewing the mitigating and aggravating circumstances to determine whether the death penalty should be imposed. *Id.* § 190.3.

Once the jury finds that the death sentence should be imposed, the trial judge reviews the evidence to determine whether the jury's findings and verdict are supported by the evidence. The judge must then state on the record the reasons for the findings. *Id.* § 190.4(e). The statute also provides for an expeditious, automatic appeal to the California Supreme Court, although the scope and content of the review the court must give is not defined. *Id.* § 190.6.

Harris argues that this procedure for imposing the death penalty violates the eighth amendment's prohibition against cruel and unusual punishment made applicable to the State of California by the fourteenth amendment because the procedure does not guide jury discretion to produce rational or consistent death sentences. In particular,

Harris contends that the 1977 capital-punishment statute under which he was sentenced is deficient because (1) it fails to provide unambiguous objective standards to guide and focus the sentencing authority's discretion; (2) it fails to establish the burden of proof a fact finder must use in weighing the aggravating and mitigating circumstances; (3) it fails to require the sentencing authority to furnish a written statement of the basis upon which it decided to impose the death penalty; and (4) it fails to provide for meaningful and effective proportionality review.

We review the constitutionality of California's 1977 death-penalty statute on the basis of the standards established in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) and their progeny. The primary concerns the Court has expressed in discussing the death penalty have been the need for guidance of the fact finder's discretion and an opportunity for review of the exercise of that discretion. The Court has thus upheld statutes providing for jury consideration of aggravating and mitigating factors, written findings stating reasons for imposition of the penalty, and a procedure designed to ensure proportionality review. *See Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). These are, then, the guiding principles we follow in determining the constitutionality of a state's death-penalty statute.

## A. *Objective Standards*

Harris contends that the California death-penalty statute violates the eighth and fourteenth amendments because it places no limit on the prosecution's intro-

---

1. At the November 7, 1978 General Election, California voters adopted an initiative measure (Proposition 7) which broadened the application of the death penalty provisions. *See Peo-*

*ple v. Frierson*, 25 Cal.3d 142, 152, 158 Cal. Rptr. 281, 599 P.2d 587 (1979). We are concerned here solely with the 1977 legislation.

duction of evidence of aggravating factors. Cal.Penal Code § 190.3. Harris also argues that the statute's failure to require that the jury specify whether the factors the jury considers in imposing the death penalty are mitigating or aggravating impermissibly broadened the jury's discretion. We reject both of these contentions.

The California statute does not limit the introduction of evidence of either mitigating or aggravating circumstances, but it does require that certain specified factors be taken into account. *Id.* The California Supreme Court has interpreted this section as not limiting the admission of evidence to matters relevant to the specified mitigating or aggravating factors. *People v. Murtishaw,* 29 Cal.3d 733, 773, 175 Cal.Rptr. 738, 631 P.2d 446 (1981).

The United States Supreme Court has upheld a death-penalty statute that permitted a jury to consider any aggravating or mitigating circumstance otherwise authorized by law so long as one statutory aggravating factor was identified before the death penalty was imposed. *See Gregg v. Georgia,* 428 U.S. at 206, 96 S.Ct. at 2940 (plurality opinion noting terms of statute). In *Proffitt v. Florida,* the Court also upheld a sentencing statute that allowed the jury to consider nonstatutory, aggravating factors. *See Proffitt v. Florida,* 428 U.S. at 256–57 n.14, 96 S.Ct. at 2968–69 n.14 (suggesting that consideration is proper as long as penalty not based solely on nonstatutory factors). And a plurality of the Supreme Court has noted that, to meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors. *See Lockett v. Ohio,* 438 U.S. at 608, 98 S.Ct. at 2966.

■ These cases suggest that, although the irregular or selective application of the penalty is to be avoided, the consideration of nonstatutory mitigating or aggravating circumstances is not objectionable in itself, as long as at least one statutory circumstance is found before the death penalty is imposed. Because the judge found several statutory aggravating circumstances in this case, we see no constitutional problem here.

Moreover, under the statute, the jury must consider certain factors in weighing aggravating and mitigating circumstances, *see* Cal.Penal Code § 190.3. These required factors provide jury guidance and lessen the chance of arbitrary application of the death penalty.

We note that the Fifth Circuit seems to have decided that the consideration of nonstatutory aggravating circumstances impermissibly increases jury discretion. *See Henry v. Wainright,* 661 F.2d 56, 58–60 (5th Cir. 1981) (introduction and consideration of nonstatutory aggravating factors error under Florida sentencing statute), *vacated and remanded on other grounds,* —— U.S. ——, 102 S.Ct. 2922, 73 L.Ed.2d 1326 (1982). To the extent our conclusion here is inconsistent with *Henry v. Wainright,* we reject the Fifth Circuit's ruling.

■ Nor do we think that the statute's failure to label factors as aggravating or mitigating invalidates the statute. The Supreme Court has previously upheld a statute that did not explicitly identify factors as aggravating or mitigating but merely asked the jury to answer several particular questions. *See Jurek v. Texas,* 428 U.S. at 270–73, 96 S.Ct. at 2955–57 (plurality opinion). Because the California statute establishes factors to guide the jury's discretion and allows for consideration of the particular aggravating and mitigating circumstances in this case, the statute is not unconstitutional in this respect.

### B. Burden of Proof

■ Harris contends that the statute's failure to specify the state's burden of proof in the second sentencing stage—determining whether the aggravating factors outweigh the mitigating ones—violates due process because it results in jury capriciousness. He argues that the state must prove beyond a reasonable doubt that the death penalty is appropriate. These contentions are without merit.

Although the statute does not specify the burden of proof at this stage, it does require use of the beyond-a-reasonable-doubt

standard in the stage where the truth of any special circumstance is determined. Unless a jury is convinced beyond a reasonable doubt of the truth of at least one special circumstance charged, it cannot even consider whether to impose the death penalty. Cal.Penal Code § 190.4(a). The statute then requires a jury to consider and take into account all mitigating and aggravating factors in determining whether to impose the death penalty. *Id.* § 190.3. And while the statute does not specify the burden of proof, a plurality of the California Supreme Court has read the statute as requiring the jury to weigh these factors before imposing the penalty. *See People v. Frierson*, 25 Cal.3d at 180, 158 Cal.Rptr. 281, 599 P.2d 587. These procedures guarantee that the jury's discretion will be guided and its consideration deliberate.

■ The United States Supreme Court has never stated that a beyond-a-reasonable-doubt standard is required when determining whether a death penalty should be imposed. In *Proffitt v. Florida*, the Court upheld a statute that did not require this standard when the jury rendered an advisory verdict on whether the death penalty should be imposed. *See Proffitt v. Florida*, 428 U.S. at 257–58, 96 S.Ct. at 2969 (plurality opinion). Although the jury's verdict in this statute is mandatory, we do not think that this difference makes this statute distinguishable from the one in *Proffitt.* Moreover, we are not aware of any instance where the state must carry such a burden of proof when attempting to convince a sentencing authority of the appropriate criminal sentence. If the Supreme Court had intended for the burden in death-penalty cases to vary from the standard burden in all other criminal sentencing, it would have said so in one of the many modern cases dealing with the death penalty.

C. *Written Findings*

■ Harris also argues that the statute violates the eighth and fourteenth amendments because it does not require the jury to make written findings delineating the basis for its decision to impose the death

penalty. The California Supreme Court has rejected this contention and held that the requirement that the judge make written findings upholding or overturning the jury's verdict is sufficient to satisfy the procedures validated in *Gregg v. Georgia* and *Proffitt v. Florida. See People v. Jackson*, 28 Cal.3d at 316–17, 168 Cal.Rptr. 603, 618 P.2d 149; *People v. Frierson*, 25 Cal.3d at 178–80, 158 Cal.Rptr. 281, 599 P.2d 587 (plurality opinion).

We agree with the California Supreme Court's conclusion because the California statute is very similar to the statute upheld in *Proffitt v. Florida*, 428 U.S. 242, 250, 96 S.Ct. 2960, 2965, 49 L.Ed.2d 913 (1976). There the judge, not the jury, set forth written findings stating the reasons why the death sentence was appropriate under the Florida statute. Under that statute, the jury's verdict was only advisory. *Id.* at 249, 96 S.Ct. at 2965. Although the jury's verdict here is mandatory, the judge

> shall review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances referred to in Section 190.3, and shall make an independent determination as to whether the weight of the evidence supports the jury's findings and verdicts. He shall state on the record the reason for his findings.

Cal.Penal Code § 190.4(e). Because the judge must determine independently whether the death penalty is appropriate and, in so doing, weigh the evidence of aggravating and mitigating circumstances, the appellate court is provided with a sufficient record upon review. On the basis of the judge's written conclusions, the appellate court can determine whether the evidence supported the jury's finding of aggravated circumstances. If the judge and the appellate court conclude that the jury verdict is supported by the evidence, the danger that the jury acted under the influence of undue passion or prejudice is negligible. *See Gregg v. Georgia*, 428 U.S. at 195, 96 S.Ct. at 2935 (plurality opinion). While it might be preferable to have the sentencer provide a written statement concerning the

basis for the decision to impose the death penalty, we cannot say that the California statute is unconstitutional because it requires only the judge to provide such a statement. The judge's statement provides an adequate basis for appellate review.

### D. *Proportionality Review*

[6] Harris' final argument under the eighth and fourteenth amendments is that the California Supreme Court's failure to conduct a proportionality review in this case renders his death penalty sentence unconstitutional. A plurality of the United States Supreme Court has approved proportionality review whether such is provided by statute, *see Gregg v. Georgia*, 428 U.S. at 167, 203, 96 S.Ct. at 2922, 2939, or by case law, *see Proffitt v. Florida*, 428 U.S. at 259, 96 S.Ct. at 2969. The Supreme Court has discussed proportionality concerning the death penalty in at least two ways. First, in several instances the Court has examined whether the death penalty was proportionate to the crime for which it was imposed. *See, e.g., Coker v. Georgia*, 433 U.S. 584, 591–92, 97 S.Ct. 2861, 2865–66, 53 L.Ed.2d 982 (1977) (sentence of death grossly disproportionate to crime of rape when no life taken) (plurality opinion); *Gregg v. Georgia*, 428 U.S. at 187 & n.35, 96 S.Ct. at 2931 & n.35 (declining to address whether death penalty disproportionate for crimes such as kidnapping or armed robbery but noting that death penalty not invariably disproportionate to murder) (plurality opinion). Second, the Court has examined whether the penalty in the case was proportionate to other sentences imposed for similar crimes. *See Gregg v. Georgia*, 428 U.S. at 198, 203, 96 S.Ct. at 2936, 2939 (plurality opinion); *id.* at 211–12, 223–24, 96 S.Ct. at 2942–43, 2948–49 (White, J., concurring). This latter proportionality review, intended to prevent the arbitrary and capricious application of the penalty, *id.* at 203, 96 S.Ct. at 2939, is what concerns us here.

In response to these cases, a plurality of the California Supreme Court in *People v. Frierson* stated that it would review each death penalty under the challenged statute to determine whether the penalty was being applied proportionately. 25 Cal.3d at 183. A majority of the Court later stated that the Court was "fully prepared to afford whatever kind of proportionality review" is constitutionally mandated by the Supreme Court. *People v. Jackson*, 28 Cal.3d at 317, 168 Cal.Rptr. 603, 618 P.2d 149. The California court, however, did not undertake any proportionality review in this case. *People v. Harris*, 28 Cal.3d 935 at 964, 171 Cal.Rptr. 679, 623 P.2d 240. Rather, the court stated that it refused to consider the petitioner's arguments concerning the constitutionality of the death penalty because it had already done so in *People v. Frierson*. It gave no indication that any type of proportionality review, as required under *Gregg v. Georgia* and *Proffitt v. Florida*, was undertaken.[2] *Id.*

■ Therefore, we must vacate the district court's denial of the petition and instruct the district court to grant the petition relieving petitioner from his sentence of death unless the California Supreme Court undertakes, within a reasonable time not to exceed 120 days from the date this order is filed, the determination of whether the penalty in this case is proportionate to other sentences imposed for similar crimes. It must be recognized, however, that given the broad range of considerations relevant in determining whether to impose the death penalty, any statistical showing based on a particular selection of "similar" cases may

---

**2.** Because we decide that the state court erred in not conducting a proportionality review of Harris' case to determine whether the imposition of the death penalty was arbitrary or capricious, it is unnecessary to decide Harris' claim that the court committed a distinct violation of due process by not providing an opportunity for such a hearing when the defendant specifically raised the claim. Harris also complains of prosecutorial arbitrariness in charging practices in San Diego County. Harris has not made a sufficient showing to support his claim. "[I]t cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts." *Gregg v. Georgia*, 428 U.S. at 225, 96 S.Ct. at 2949 (1976) (White, J., concurring).

not be conclusive of the usual practice. As the Supreme Court has explained, *Furman* did "not require that all sentencing discretion be eliminated, but only that it be 'directed and limited,' so that the death penalty would be imposed in a more consistent and rational manner and so that there would be a 'meaningful basis for distinguishing the ... cases in which it is imposed from ... the many in which it is not.'" *Lockett v. Ohio*, 438 U.S. 586, 601, 98 S.Ct. 2954, 2963, 57 L.Ed.2d 973 (1978), *citing Gregg v. Georgia*, 428 U.S. at 188–89, 96 S.Ct. at 2932–33. "[T]he isolated decision of a jury to afford mercy" in a particular case does not make death sentences imposed on other defendants unconstitutional as long as the sentencing system does not create a substantial risk of arbitrariness and caprice. *Gregg v. Georgia*, 428 U.S. at 203, 96 S.Ct. at 2939 (plurality opinion).

## II. *Discriminatory Application of the Death Penalty*

Harris contends that he is entitled to an evidentiary hearing on his claims that the California death-penalty statute violates the equal protection clause of the fourteenth amendment because it is applied: (1) discriminatorily against defendants convicted of murdering whites, as opposed to persons of other races and ethnic groups; (2) discriminatorily against males; and (3) discriminatorily on the basis of the age and socio-economic status of the offender. Harris argues that because the state did not provide him an evidentiary hearing on his claims, he is entitled to a hearing in federal court.

Where the facts underlying a constitutional claim are in dispute, a federal court in habeas corpus must hold an evidentiary hearing if the habeas petitioner did not receive a full and fair evidentiary hearing in a state court. *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963); *Briggs v. Raines*, 652 F.2d 862, 866 (9th Cir. 1981). *See* 28 U.S.C. § 2254(d)(6). To be entitled to the hearing, a habeas petitioner must show that (1) he has alleged facts which, if proved, would entitle him to relief, and (2) an evidentiary hearing is required to establish the truth of his allegations. *Pierce v. Cardwell*, 572 F.2d 1339, 1340–41 (9th Cir. 1979). We do not believe that the State accorded Harris a full and fair hearing on these constitutional claims. Although we do not decide whether Harris has a right to a hearing in federal court under *Pierce*, we believe that the district court should, if it becomes necessary, provide an opportunity to develop the factual basis and arguments concerning the race-discrimination and gender-discrimination claims.

### A. *Race Discrimination*

Harris contends that the California death-penalty statute is administered in an intentionally discriminatory fashion against defendants convicted of killing white persons, as opposed to victims of other races or ethnic backgrounds. In support of his contention, Harris submitted affidavits showing that, in 1980, 67 percent of the persons receiving a death sentence in robbery-murder circumstances had murdered white victims, while only 4 percent had murdered black victims, and 29 percent had murdered victims of other minority groups. Whether the statistical discrepancy is caused by a qualitative difference in the murders is a question that can be resolved only at a hearing. Harris concedes that factors other than the race of the victim may influence the statistics, but there has been no opportunity to explore the extent of their significance.

It is unclear whether discrimination can be inferred from such statistical showings. Long-continuing and marked statistical disparities between races, however, may indicate a sufficient pattern to shift the burden to the state to furnish a constitutionally-acceptable explanation for such disparities. In the absence of at least some indication that the disproportionate impact can be explained on nonracial grounds, Harris would seem to be entitled to an evidentiary hearing on his contention if such becomes necessary.

The allegation of discriminatory application of the death penalty under the cruel-and-unusual-punishment clause resembles in all essential respects the contention that the death sentence is imposed in an arbitrary and capricious fashion. *See Spinkellink v. Wainwright,* 578 F.2d 582, 613 (5th Cir. 1978).[3] Because we have previously discussed this allegation, we need not discuss it again here. Instead, we focus on Harris' contention that the death-penalty statute, although facially neutral, is being administered intentionally in a discriminatory manner in violation of equal protection.

In *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court made clear that, even if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that effect can be traced to a discriminatory purpose. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 272, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). The disproportionate effect of official action is not, however, irrelevant to a claim of racial discrimination. *Wash-*

*ington v. Davis,* 426 U.S. at 241, 96 S.Ct. at 2048. In fact, it often provides an important starting point in the inquiry. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. at 266, 97 S.Ct. at 564. Furthermore, there may be cases in which effect alone can unmask an invidious classification. *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. at 275, 99 S.Ct. at 2294.

It is not necessary, however, for us now to decide whether this is such a case. Both sides have not had an opportunity to present evidence and, therefore, Harris could not prove the discriminatory intent or purpose required by *Washington v. Davis* and *Arlington Heights.* Although we do not decide that Harris has stated a claim for relief, we think that if it becomes necessary the district court should provide the parties with the opportunity to develop the evidence and arguments essential to an adequate review of this claim.[4]

### B. *Gender Discrimination*

 Harris also contends that the California death-penalty statute is intentionally applied in a discriminatory fashion against males. He submitted affidavits showing that, in California between 1978–80, 1,164

---

**3.** Although we do not decide whether Harris has stated a claim for relief, we note that in *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), the Fifth Circuit held that the petitioner, who raised claims similar to those Harris makes here, was not entitled to an evidentiary hearing because, even assuming that the factual allegations were true, he was not entitled to relief as a matter of law. The Fifth Circuit ruled that if a state follows a properly-drawn statute in imposing the death penalty, then the arbitrariness and capriciousness condemned in *Furman* have been conclusively removed, and a closer comparison of the defendant's case with other death-penalty cases is unnecessary. *Id.* at 604.

We also note that the Eleventh Circuit, which adopted as precedent the decisions of the former Fifth Circuit, *see Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), has read *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), as implicitly disapproving part of the language in *Spinkellink. See Proffitt v. Wainright,* 685 F.2d 1227, 1261–62 n. 52 (11th Cir. 1982) (concluding that

*Spinkellink's* language precluding federal courts from reviewing state court application of capital sentencing criteria no longer valid). We need not decide here, however, the effect of *Spinkellink* on Harris' claims or of *Godfrey* on the *Spinkellink* decision.

**4.** The Supreme Court has long been concerned with racial discrimination in the imposition of the death penalty. *See Furman v. Georgia,* 408 U.S. 238, 250–51, 256–57, 92 S.Ct. 2726, 2732–33, 2735–36, 33 L.Ed.2d 346 (Douglas, J., concurring); *id.* at 365–66, 92 S.Ct. at 2790–91 (Marshall, J., concurring); *id.* at 309–10, 92 S.Ct. at 2762–63 (Stewart, J., concurring). Recently, in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), Justice Marshall noted that "[t]he disgraceful distorting effects of racial discrimination and poverty continue to be painfully visible in the imposition of death sentences." *Id.* at 439, 100 S.Ct. at 1770 (Marshall, J., concurring), *citing* NAACP Legal Defense and Educational Fund, Death Row, USA, 1 (April 20, 1980).

persons were convicted of murder in the first or second degree, of which only 64, or 5.5 percent, were females. Of the 98 persons sentenced to death during this period, none were female. Harris' expert witness concluded that the total exclusion of women from the pool of those defendants receiving the death sentence is indicative of gender influencing the process. The expert admitted, however, that "before any conclusions can be drawn about the actual existence of discrimination based on gender . . . further analysis [is required] to determine whether the influence of other factors than gender can account for the disparities observed here."

The Supreme Court has noted that the principles of *Washington v. Davis* and *Arlington Heights* apply with equal force to a claim involving alleged gender discrimination. *Personnel Administration of Massachusetts v. Feeney*, 442 U.S. at 274, 99 S.Ct. at 2293. Although we do not decide that the total exclusion of women from persons receiving the death sentence would be a violation of equal protection, we think that if it becomes necessary the district court should provide Harris and the State with the opportunity to present evidence and arguments essential to an adequate review of this claim.

### C. *Wealth and Age Discrimination*

■ Harris also contends that the death penalty is being intentionally applied discriminatorily on the basis of the defendant's age and socio-economic status. Harris, however, has made no showing in support of this claim. He argues that the state has the information necessary to present this claim, but has refused to disclose it.

Harris' conclusory allegations do not provide a sufficient basis to obtain a hearing in federal court. We decline his invitation to hold that he has a right to an evidentiary hearing absent some stronger showing.

### III. *Pretrial Publicity*

Pervasive media coverage of Harris and his crimes started with his televised capture for bank robbery. The pretrial publicity apparently included stories that Harris and his brother had confessed to the crimes, that Harris had previously been convicted of manslaughter and that Harris had violated his parole. Numerous editorials and letters to the editor called for the death penalty and a television poll overwhelmingly showed that viewers supported the death penalty in this case. Even the battle between the U.S. Attorney's and District Attorney's offices concerning who would have the first opportunity to prosecute Harris received extensive coverage by the local media for over two weeks. *See People v. Harris*, 28 Cal.3d at 965–69, 171 Cal.Rptr. 679, 623 P.2d 240 (Bird, C. J., dissenting).

Asserting that the extensive publicity had made a fair trial impossible, Harris made a pretrial motion for a change of venue. The trial court denied the motion. The California Supreme Court upheld the denial because it believed that the size of the community dissipated the effect of the pretrial publicity and that the voir dire testimony of the jurors demonstrated no prejudicial effect from the publicity. *Id.* at 949–50, 171 Cal.Rptr. 679, 623 P.2d 240.

The district court agreed with the California Supreme Court's conclusion that the pretrial publicity did not require a change of venue. In reaching that decision, the district court failed to request and examine any of the articles or broadcasts or the voir dire transcript.

■ This court has consistently required a district court, when considering a petition for a writ of habeas corpus, to "make its determination as to the sufficiency of the state court findings from an independent review of the record, or otherwise grant a hearing and make its own finding on the merits." *Turner v. Chavez*, 586 F.2d 111, 112 (9th Cir. 1978). *See e.g. Pierre v. Thompson*, 666 F.2d 424, 427 (9th Cir. 1982); *Patterson v. Warden*, 624 F.2d 69, 70 (9th Cir. 1980); *Cody v. Morris*, 623 F.2d 101, 103 (9th Cir. 1980); *Griff v. Rhay*, 455 F.2d 494, 495 (9th Cir. 1972). Unless it is shown that the district court examined all relevant parts of the state court record, this court

cannot affirm a district court's judgment dismissing a habeas corpus petition. *Rhinehart v. Gunn*, 598 F.2d 557, 558 (9th Cir. 1979).

 Where prejudicial pretrial publicity is alleged, the relevant parts of the state court record include, at a minimum, copies of the newspaper articles and, if available, any transcripts of television and radio broadcasts. Because a federal court sitting in habeas has a duty "to independently evaluate the *voir dire* testimony of the impaneled jurors," *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961), the entire transcript of the voir dire testimony should also be examined. It is only after examination of such relevant parts of the record that the district court can determine that the state court findings are supported by the record.

 The Supreme Court's decision in *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1982), has not altered the district court's duty under *Irvin* and *Rhinehart* to examine relevant parts of the state court record, particularly the voir dire transcript. *Sumner* requires a federal court in a habeas proceeding generally to accord a statutory presumption of correctness of state court findings, but such a presumption is not required if the federal court concludes that findings are not fairly supported by the record. *Sumner v. Mata*, 449 U.S. at 550, 101 S.Ct. at 770; *see* 28 U.S.C. § 2254(d)(8).

On remand, the district court should, if necessary, request and examine all relevant parts of the state court record to determine whether the record supports the state court's findings. To the extent that findings made by the California Supreme Court, such as the makeup of the jury impaneled to hear the case, are supported by the record, the district court, pursuant to *Sumner*, must presume the correctness of such findings. We note, however, that the majority of the California Supreme Court made no findings on the issues usually considered by a federal court in deciding whether a defendant has been accorded a fair trial under federal standards, such as the number of

jurors interviewed at voir dire, the number excused for cause or peremptorily challenged, or the number who admitted to having preconceived notions regarding Harris' guilt. All of these factors have been considered by federal courts in deciding whether a change of venue should have been granted. *See, e.g., Dobbert v. Florida*, 432 U.S. 282, 302–03, 97 S.Ct. 2290, 2302–03, 53 L.Ed.2d 344 (1977); *Murphy v. Florida*, 421 U.S. 794, 796, 95 S.Ct. 2031, 2034, 44 L.Ed.2d 589 (1975); *Sheppard v. Maxwell*, 384 U.S. 333, 345, 86 S.Ct. 1507, 1513, 16 L.Ed.2d 600 (1966); *Narten v. Eyman*, 460 F.2d 184, 187–88 (9th Cir. 1969).

### IV. *Fifth Amendment Issues*

Dr. Wait Griswold, a psychiatrist, interviewed Harris at the police station after his arrest and confession. Harris was given standard *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and agreed to speak with Dr. Griswold. Harris' statements to Dr. Griswold were used against Harris at the penalty phase of his bifurcated trial to rebut his testimony that he felt remorse for the killings.

Harris contends that the *Miranda* warnings were inadequate because the interrogation was conducted by a psychiatrist. He also argues that his statements were involuntary and made without an intelligent waiver of counsel because he was not aware of the capital nature of his crimes and was not specifically advised that his statements could be used at the penalty phase of his trial by the prosecution in seeking the death penalty.

Harris' argument relies heavily on the recent Supreme Court decision of *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). In *Estelle*, the defendant had been indicted for murder and the court had already appointed counsel. The State of Texas had announced its intention to seek the death penalty. The court then ordered a psychiatric examination to determine the defendant's competency to stand trial. Thereafter, the defendant was tried

by jury and convicted. At the separate sentencing proceedings, the psychiatrist testified as to the defendant's future dangerousness, an element required under Texas law before the death penalty may be imposed, based on the psychiatrist's pretrial examination of the defendant. *Id.* at 456–58, 101 S.Ct. at 1870.

The Court ruled that Smith's fifth and sixth amendment rights had both been violated. His fifth amendment right was violated because he had not been advised of his *Miranda* rights before the pretrial examination. His sixth amendment right was violated because he had already been indicted, and his court-appointed attorney was not notified in advance that the psychiatric examination would encompass the issue of his client's future dangerousness. The defendant therefore had been "denied the assistance of his attorneys in making the significant decision whether to submit to the examination and to what end the psychiatrist's findings could be employed." *Id.* at 471, 101 S.Ct. at 1877.

*Estelle* differs from the present case in at least two significant respects. First, *Estelle* involved a post-arraignment, court-ordered psychiatric evaluation to determine the defendant's competency to stand trial. In the present case, Harris had not yet requested or retained counsel, nor had he been arraigned or indicted. Thus, sixth amendment concerns implicated in *Estelle* are not present here. Second, the defendant in *Estelle* did not receive any *Miranda* warnings, while there is no dispute that Harris received several *Miranda* warnings. Because of these differences, *Estelle*, although instructive, does not control the disposition of Harris' appeal.

A. *Adequacy of Miranda Warnings*

■ Harris argues that the standard *Miranda* warnings were inadequate because he was not specifically informed that the prosecution could use his statements in seeking the death penalty at the penalty phase of his trial. Although *Estelle* contains some language that arguably can be construed to support that position, we read *Estelle* to require that only standard *Miranda* warnings need be given in this situation.

In *Estelle*, the Court stated that:

A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the state could not rely on what he said to [the psychiatrist] to establish his future dangerousness.

*Id.* at 468, 101 S.Ct. at 1876. This passage shows that the Court did not hold that a defendant must be specifically advised that his statement may be used against him at a capital sentencing proceeding. As noted earlier, *Estelle* addressed a situation where no *Miranda* warnings had been given. The specific reference to a "capital sentencing proceeding" does not mandate that a more specific warning be given; it merely amplifies the Court's earlier rejection of the State's contention that fifth amendment concerns were not even implicated in the use of the defendant's testimony at the penalty phase, as opposed to the guilt phase of the trial. *Id.* at 462–63, 101 S.Ct. at 1872–73. In addition, the reference to informing a defendant of his "right to remain silent *and the possible use of his statements*," reasonably construed, requires only the standard *Miranda* warnings, not a special caveat concerning the use of his statements at the penalty phase of a capital proceeding. Here, Harris was advised that anything he said could and would be used against him in a court of law. *Estelle* does not require anything more elaborate.

Harris also argues that more explicit warnings regarding the use of statements at a capital sentencing proceeding should be required even if *Estelle* does not mandate such a holding. His only support for this proposition is that such a warning would comport with certain psychiatric association ethical codes. This argument attempts to

confer "Super-*Miranda*" rights upon suspects whom police psychiatrists seek to interview. We decline to extend *Miranda* in such a manner and hold that Harris was entitled only to standard *Miranda* warnings, which he received.

### B. *Voluntariness of Harris' Statements*

Again relying on language in *Estelle*,[5] Harris contends that his statements to the psychiatrist were not voluntary and, because he was not given the more detailed warnings, his waiver of the right to counsel was not knowing and intelligent. Harris also argues that, under the circumstances, he was unconstitutionally misled into thinking that the psychiatrist was there to help him.

■ We find these contentions to be without merit. Harris' waiver of his right to counsel and the voluntariness of his subsequent statements are judged under fifth amendment standards. *See Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981). Because Harris' psychiatric interview occurred before arraignment and indictment, no sixth amendment right to counsel was involved. *See Moore v. Illinois*, 434 U.S. 220, 226–29, 98 S.Ct. 458, 463–65, 54 L.Ed.2d 424 (1977); Any reliance on *Estelle* is, therefore, misplaced. The *Estelle* Court emphasized that its holding was directed at the specific type of psychiatric investigation at issue there, a court-ordered examination "conducted [ostensibly to determine competency to stand trial] *after adversary proceedings have been instituted.*" *Estelle v. Smith*, 451 U.S. at

470 n.14, 101 S.Ct. at 1877 n.14 (emphasis added). The Court explained that it was not

> concerned . . . with the limited right to the appointment and presence of counsel recognized as a Fifth Amendment safeguard in *Miranda v. Arizona* . . . . Rather, the issue before us is whether a defendant's Sixth Amendment right to the assistance of counsel is abridged when the defendant is not given prior opportunity to consult with counsel about his participation in the psychiatric examination.

*Id.* at 470 n.14, 101 S.Ct. at 1877 n.14. Thus, in *Estelle* the Court was concerned with situations where counsel had already been appointed or otherwise obtained, the defendant had evidenced a desire to retain counsel, or the defendant had indicated that he wished to remain silent. None of those circumstances were present here. Harris' sixth amendment right to counsel had not yet attached and he had waived his fifth amendment right to counsel.

■ Finally, Harris' bare allegation that he was somehow misled into thinking that the psychiatrist was there to treat him or help him is insufficient to raise a factual issue. The evidence overwhelmingly indicates that he knowingly and intelligently waived his fifth amendment rights · and gave his statements to Dr. Griswold voluntarily.

### C. *Subsidiary Issues Concerning Psychiatric Testimony*

■ Harris claims that Dr. Griswold lied about having been hired to testify in the

---

**5.** In *Estelle*, the Supreme Court noted that:

> Because "[a] layman may not be aware of the precise scope, the nuances, and the boundaries of his Fifth Amendment privilege," the assertion of that right "often depends upon legal advice from someone who is trained and skilled in the subject matter." As the Court of Appeals observed, the decision to be made regarding the proposed psychiatric evaluation is "literally a life or death matter" and is "difficult . . . even for an attorney" because it requires "a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing." It follows logi-

cally from our precedents that a defendant should not be forced to resolve such an important issue without "the guiding hand of counsel."

451 U.S. at 471, 101 S.Ct. at 1877 (citations omitted).

Harris argues that this shows that *no* knowing and intelligent waiver of counsel can be made where the prosecution seeks an *ex parte* psychiatric interview with a suspect facing possible capital punishment. The above quotation, however, was a discussion of the importance of having Smith's already-appointed counsel available to help him make the decision; it was not intended to cover all circumstances where a psychiatrist might be involved.

past about as often by prosecution attorneys as by defense attorneys. This claim, however, raises no constitutional issue. Rather, this is purely a state-law evidentiary issue not cognizable in a petition for habeas corpus. *See* 28 U.S.C. § 2254(a) (court may entertain habeas application only on ground that custody violates the constitution or laws or treaties of United States).

Harris also contends that the surprise nature of Dr. Griswold's testimony violated due process. We find this argument to be without merit. In professing remorse, Harris could have well expected rebuttal testimony. He concedes that to the extent the psychiatrist's testimony served as rebuttal to Harris' expression of remorse, no advance notice that the psychiatrist would testify was required. Harris argues, however, that the prosecutor used the testimony to do far more than rebut Harris' alleged remorse. The California Supreme Court concluded, however, that Dr. Griswold's testimony was properly characterized and utilized as rebuttal testimony. *See People v. Harris*, 28 Cal.3d at 961–62, 171 Cal.Rptr. 679, 623 P.2d 240. No federal ground is presented to dispute that characterization on this appeal.

## V. *Special Circumstances*

■ Under § 190.2 of the California Penal Code, the penalty for a defendant found guilty of first degree murder is death or confinement for life without possibility of parole when certain special circumstances are charged and specially found to be true. *Cal.Penal Code § 190.2.* The State charged Harris with three special circumstances for *each* murder: (1) multiple murders (§ 190.2(c)(5)); (2) murder during robbery (§ 190.2(c)(3)(i)); and (3) murder during a kidnapping (§ 190.2(c)(3)(ii)) and then asked for a single death penalty. Thus, Harris was charged with six special circumstances, all of which the jury unanimously found to be true beyond a reasonable doubt.

Harris argues that charging him twice with the special circumstances artificially inflated the aggravating factors considered by the jury in determining Harris' penalty. According to Harris, reversal is required because it is impossible to determine from the record the resulting degree of prejudice to him.

We conclude that the jury could not have been misled in this case by the duplicative charging of special circumstances. It was clear throughout the trial that two murders, not four, were committed and that both murders arose out of one incident. It is highly unlikely that the jury simply counted up the special circumstances charged and based its verdict on such calculation. We cannot reverse on the basis of speculation of that nature.

## VI. *Exclusion of Testimony at Sentencing Trial*

■ Harris contends that the court erred in refusing to admit the testimonies of a former warden of San Quentin and of a television correspondent. His avowed purpose was to provide the jury with an understanding of some of the differences between life imprisonment and a death sentence, to explain how the death penalty is carried out, and to vividly portray to the jury the last few moments of a person who has been sentenced to death in the gas chamber. Harris argues that evidence of the nature of the possible sentence is relevant and crucial to whether the death sentence is appropriate.

In *Gregg v. Georgia*, a plurality of the Supreme Court, commented that:

> [s]o long as the evidence introduced and arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it is desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

428 U.S. at 203–04, 96 S.Ct. at 2939. We read this language as referring to the trier's need, at the sentencing stage, for information on the defendant's character, the nature of the crime, and past acts—information which may be too prejudicial for consideration at the guilt phase—and not for information on the nature of the proposed penalty.

Our reading is consistent with the plurality opinion in *Lockett v. Ohio*, which states that

> the Eighth and Fourteenth Amendments require the sentencer, in all but the rarest kind of capital case, not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.

438 U.S. at 604, 98 S.Ct. at 2964 (emphasis in original) (footnotes omitted). There, the plurality specifically added that nothing in the opinion limited the traditional authority of a court to exclude, as irrelevant, evidence *not bearing* on the defendant's character, prior record, or the circumstances of the offense. *Id.* at 604 n.12, 98 S.Ct. at 2964 n.12. We conclude, therefore, that the trial court did not err in refusing to admit the proffered testimony explaining how the death penalty is carried out. Such evidence did not bear on the defendant's character, prior record, or the circumstances of the offense.

## VII. *Conclusion*

Because the California Supreme Court did not undertake the proportionality review it announced in *People v. Frierson*, 25 Cal.3d at 183, 158 Cal.Rptr. 281, 599 P.2d 587, and in *People v. Jackson*, 28 Cal.3d at 317, 168 Cal.Rptr. 603, 618 P.2d 149, we vacate the district court's denial of the petition and instruct the district court to grant the petition relieving petitioner from his sentence of death unless the California Supreme Court undertakes, within a reasonable time not to exceed 120 days from the date that this order is filed, the proportionality review. We also instruct the district court to take whatever other actions that are subsequently necessary and consistent with this opinion.

VACATED and REMANDED.

CANBY, Circuit Judge, concurring:

I concur in the judgment and in all of the court's opinion except Section I.C., which holds the California statute constitutional despite the absence of a requirement of a written statement by the jury of the reasons for its imposition of the death penalty. On that point, I respectfully disagree.

The purpose of requiring a sentencing jury to provide written findings in support of a death sentence is to enable appellate courts to ensure that the jury's discretion was properly exercised and that the sentence was not arbitrary or capricious. *Gregg v. Georgia*, 428 U.S. 153, 195, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859 (1976) (plurality opinion). In the absence of such written findings, the reviewing court can only assume that the jury acted within its instructions. While that assumption is commonly employed in reviewing general verdicts of guilt, it is not a permissible basis for approval of a death sentence.

In *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), the Supreme Court struck down a statutory scheme under which five specific types of murder carried a mandatory death sentence. The statute also required that the jury in each such case be instructed on lesser included offenses of second-degree murder and manslaughter, whether or not the evidence justified those instructions. The state argued that the specificity of categories of capital murders was sufficient to guide the jury and avoid the danger of capriciousness that had led the Supreme Court to strike down other death penalty statutes. The plurality rejected the state's argument and commented as follows:

> This responsive verdict procedure not only lacks standards to guide the jury in selecting among first-degree murderers, but it plainly invites the jurors to disregard their oaths and choose a verdict for a lesser offense whenever they feel the death penalty is inappropriate. There is an element of capriciousness in making the jurors' power to avoid the death penalty dependent on their willingness to accept this invitation to disregard the trial judge's instructions. The Louisiana procedure neither provides standards to channel jury judgments nor permits review to check the arbitrary exercise of

the capital jury's *de facto* sentencing discretion.

*Id.* at 334–35, 96 S.Ct. at 3006–07. This language indicates that some method must be provided to determine whether the sentencing jury followed instructions and whether its death sentence was arbitrarily imposed. While California has provided a system that furnishes standards to guide the jury initially, it has not required from the jury any documentation to permit the requisite review of the jury's death sentence.

The majority relies, as did the California Supreme Court, on the fact that the trial judge is required by the California statute to review the jury's sentence and to make written findings in support of his or her determination to uphold or set aside the jury's sentence. The majority finds this system sufficiently close to that approved in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976), to render it constitutional. In *Proffitt*, however, the statute imposed upon the judge, not the jury, the final decision whether or not to pass the death sentence. The judge was required to set forth his or her reasoning in written form, which permitted the necessary appellate review. In the present case, the California statute places the judge in an entirely different position. The death sentence itself is imposed by the jury. That sentence will stand unless the judge finds it contrary to law or not supported by the evidence. The judge's reasons for approving the jury's sentence need not be the reasons that the jury, the actual sentencing authority, relied upon in imposing the death sentence. Review of the judge's findings is therefore not an adequate substitute for an effective review of the jury's determination to impose the death sentence. Because the California statute fails to require written findings by the jury that would permit review to determine whether the death sentence was arbitrarily imposed, it violates the eighth and fourteenth amendments.