**Robert Alton HARRIS, Petitioner,**

**v.**

**R. PULLEY, Warden of the California State Prison at San Quentin, California, Respondent.**

No. 84–6433.

United States Court of Appeals, Ninth Circuit.

Argued Nov. 5, 1986.

Submitted June 29, 1988.

Decided July 8, 1988.

As Amended on Denial of Rehearing and Rehearing En Banc Sept. 28, 1989.

Michael J. McCabe, and Charles M. Sevilla, Cleary and Sevilla, San Diego, Cal., for petitioner.

John K. Van De Kamp, Atty. Gen., State of Cal., John W. Carney, and Michael D. Wellington, Supervising Deputy Attys. Gen., San Diego, Cal., for respondent.

Julius L. Chambers, James M. Nabrit, III, John Charles Boger, Deval L. Patrick, NAACP, and Anthony G. Amsterdam, New York University School of Law, NAACP, New York City, Michael G. Millman and Eric S. Multhaup, California Appellate Project, San Francisco, Cal., for amicus curiae.

Before ALARCON, BRUNETTI and NOONAN, Circuit Judges.

ALARCON, Circuit Judge:

Robert Alton Harris (hereinafter Harris) appeals from the denial of his petitions for a writ of habeas corpus challenging the constitutionality of his convictions for two counts of murder and the sentence of death under California's 1977 capital sentencing law.[1]

## PROCEDURAL HISTORY

On March 6, 1979, a California jury in a bifurcated trial convicted Harris of two counts of murder and sentenced him to death. On February 11, 1981, the California Supreme Court affirmed the convictions and the sentence of death on direct appeal. *People v. Harris*, 28 Cal.3d 935, 623 P.2d 240, 171 Cal.Rptr. 679 (1981). On that

same date, the California Supreme Court denied Harris' petition for a writ of habeas corpus which had been filed simultaneously with his automatic appeal. The United States Supreme Court denied certiorari. *Harris v. California*, 454 U.S. 882, 102 S.Ct. 365, 70 L.Ed.2d 192 (1981).

On November 24, 1981, the Superior Court for San Diego County denied Harris' second state petition for a writ of habeas corpus. The California Supreme Court denied review of the petition. On June 7, 1982, the United States Supreme Court denied certiorari. *Harris v. California*, 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1322 (1982).

On March 5, 1982, Harris filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Southern District of California, No. CV 82–0249 (hereinafter first federal petition). On March 12, 1982, the district court denied the first federal petition without an evidentiary hearing. The district court refused to stay Harris' execution, but issued a certificate of probable cause. On March 12, 1982, we issued a stay of execution pending appeal of the denial of the first federal petition for habeas corpus. While the appeal was pending in this court, Harris filed a second petition for a writ of habeas corpus in the Superior Court for San Diego County on April 16, 1982, which was denied May 4, 1982. On June 30, 1982, the California Supreme Court refused to hear the petition. On August 13, 1982, Harris filed a second petition for a writ of habeas corpus pursuant to section 2254 in the district court, No. CV 82–1005 (hereinafter second federal petition).

In *Harris v. Pulley*, 692 F.2d 1189 (9th Cir.1982) (per curiam) (hereinafter *Harris I*), we affirmed as to some of the issues but vacated the district court's denial of the first federal petition because the California Supreme Court did not undertake proportionality review of Harris' sentence. *Id.* at 1196–97. We also ordered that "the district court should, if necessary, request and examine all relevant parts of the state

---

1. Harris was sentenced under the 1977 California death penalty statute, 1 Cal.Stat. 1977, ch. 316, 1255–1266, which was codified at Cal. Penal Code Ann. §§ 190–190.6. The 1977 statute was replaced in late 1978 by the substantially

similar provisions now in effect. *See* Cal. Penal Code Ann. §§ 190–190.7 (West Supp.1987). Unless otherwise noted, references in this opinion are to the 1977 statute.

court record to determine whether the record supports the state court's findings" on the discrimination and pretrial publicity claims. *Id.* at 1200. As to Harris' discrimination claims, we stated that "if it becomes necessary, [the district court should] provide an opportunity to develop the factual basis and arguments concerning the race-discrimination and gender-discrimination claims." *Id.* at 1197.

The State filed a petition for certiorari presenting the question whether proportionality review is required by the United States Constitution. 460 U.S. 1036, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983). The United States Supreme Court reversed and remanded, concluding that California's capital sentencing system is constitutional without a comparative proportionality review. *Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984).

Upon remand, the district court consolidated the unresolved issues contained in the first and second federal petitions. The issues we remanded to the district court raised in the first federal petition were the prejudicial effect of the pretrial publicity and the discrimination claims based on the race of the victim, and the gender and age of the defendant. In the second federal petition, Harris presented federal constitutional issues regarding (1) "death qualification" of the jury, (2) presentation to the jury of nonstatutory aggravating factors involving the defendant's "character, background, history, mental condition and physical condition," (3) ineffectiveness of counsel at the penalty phase, and (4) denial of due process for failure of the State to grant his postconviction request for a neurological examination. The district court permitted each party to submit additional briefs and affidavits on the remaining issues. The district court denied the consolidated petitions for a writ of habeas corpus and issued a certificate of probable cause.

On this appeal, Harris contends that the State violated his federal constitutional rights in the following respects:

1. He was denied his right to a fair trial before an impartial jury, and the district court did not permit an evidentiary hearing on this issue, because of the pretrial publicity;

2. He was denied effective assistance of counsel at the penalty phase of his trial under the sixth amendment;

3. He was denied a post-conviction electroencephalogram (hereinafter EEG) examination to prove ineffectiveness of trial counsel in violation of his due process rights under the fourteenth amendment;

4. He was denied his sixth amendment right to a fair and impartial jury because of the exclusion of jurors opposed to the death penalty;

5. He was denied his right to an evidentiary hearing on his equal protection claims that California's death penalty statute was applied discriminatorily based on the gender and age of the defendant, and race of the victims;

6. He was denied his right to due process because California's capital sentencing statute, Cal.Penal Code § 190.3(h) (1977), permits the arbitrary consideration of a defendant's age as an aggravating factor; and,

7. He was denied his rights under the eighth and fourteenth amendments because of the instructions given to the jury at the penalty phase of the trial.

We address each of these contentions and the facts pertinent thereto under separate headings.

## DISCUSSION

### I. PRETRIAL PUBLICITY

Harris contends the pretrial publicity denied him a fair trial by an impartial jury in violation of the sixth amendment to the Constitution of the United States. Harris claims prejudice must be presumed in this matter because of the pervasive media coverage resulting from the public dispute between federal and state prosecutors over which office would be first to prosecute Harris. Alternatively, Harris argues that the responses given during the voir dire examination demonstrate actual prejudice to his right to a fair trial before an impartial jury.

In *Harris I*, we described the nature and scope of the pretrial publicity in this matter as follows:

> Pervasive media coverage of Harris and his crimes started with his televised capture for bank robbery. The pretrial publicity apparently included stories that Harris and his brother had confessed to the crimes, that Harris had previously been convicted of manslaughter and that Harris had violated his parole. Numerous editorials and letters to the editor called for the death penalty and a television poll overwhelmingly showed that viewers supported the death penalty in this case. Even the battle between the U.S. Attorney's and District Attorney's offices concerning who would have the first opportunity to prosecute Harris received extensive coverage by the local media for over two weeks. *See People v. Harris*, 28 Cal.3d at 965–69, 171 Cal.Rptr 679, 623 P.2d 240 (Bird, C.J., dissenting).

692 F.2d at 1199.

### A. Denial of Change of Venue

Prior to jury selection, Harris made a motion for a change of venue pursuant to Cal.Penal Code Ann. § 1033(a) (West 1985) on the ground that there was a reasonable likelihood that because of extensive publicity, a fair and impartial trial could not be had in the County of San Diego. This pretrial motion was denied. Following voir dire examination of the jury, Harris renewed his motion for a change of venue. The trial court denied the second motion. The California Supreme Court denied Harris' petition for a writ of mandate to compel the trial court to grant a change of venue without opinion.

On direct appeal following Harris' conviction, the California Supreme Court reviewed the record and concluded that the state trial judge did not abuse his discretion in denying the motion for a change of venue. California's highest court reasoned that the size of the community dissipated the effect of the pretrial publicity and the voir dire testimony demonstrated no actual prejudice. *Harris*, 28 Cal.3d at 949–50, 623 P.2d at 247, 171 Cal.Rptr. at 686.

After the California Supreme Court affirmed the judgment and denied his writ of habeas corpus, Harris filed his first federal petition for a writ of habeas corpus in which he claimed, inter alia, that he was denied a fair trial because of pervasive, prejudicial publicity. The district court denied the first federal petition. The record of the district court's proceedings did not reveal whether it had examined "all relevant parts of the state court record" on the question of the effect of pretrial publicity on his right to a fair and impartial jury. *Harris I*, 692 F.2d at 1199. In *Harris I*, we stated on remand that "the district court should, if necessary, request and examine all relevant parts of the state court record to determine whether the record supports the state court's findings." *Id.* at 1200.

On remand, the district court examined the state court record, including the exhibits presented at the motion for a change of venue and the reporter's transcript of the evidentiary hearing on the motion and the voir dire of the jury. The district court ruled (1) the publicity surrounding Harris' case did not warrant a presumption of prejudice and (2) the voir dire of the jury, viewed in light of the passage of time between the commission of the homicides and trial, demonstrated that Harris was not deprived of his right to a fair and impartial jury.

### B. Standard of Review

"Our duty as a federal court sitting in habeas corpus is to make an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible." *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir.), *cert. denied*, 469 U.S. 838, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984) (citing *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)). A reviewing court must independently examine the exhibits containing news reports about the case for volume, content, and timing to determine if they were prejudicial. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1035, 104 S.Ct. 2885, 2890, 81 L.Ed.2d 847 (1984); *Murphy v. Florida*, 421 U.S.

794, 802–03, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975); *Estes v. Texas*, 381 U.S. 532, 536, 85 S.Ct. 1628, 1629, 14 L.Ed.2d 543 (1965); *Rideau v. Louisiana*, 373 U.S. 723, 724–25, 83 S.Ct. 1417, 1418, 10 L.Ed.2d 663 (1963); *Irvin*, 366 U.S. at 725–26, 81 S.Ct. at 1644; *Bashor*, 730 F.2d at 1234–35; *United States v. McDonald*, 576 F.2d 1350, 1354 (9th Cir.), *cert. denied sub nom. Besbris v. United States*, 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978); *United States v. Green*, 554 F.2d 372, 376 (9th Cir.1977); *United States v. Robinson*, 546 F.2d 309, 311 (9th Cir.1976), *cert. denied sub nom. Chew v. United States*, 430 U.S. 918, 97 S.Ct. 1333, 51 L.Ed.2d 597 (1977). "Determinations of juror bias are factual determinations to which the presumption of correctness under 28 U.S.C. § 2254(d) applies, although the constitutional standard of jury impartiality is a question of law." *Lincoln v. Sunn*, 807 F.2d 805, 814–15 (9th Cir.1987) (citations omitted); *Austad v. Risley*, 761 F.2d 1348, 1354 (9th Cir.) (en banc), *cert. denied*, 474 U.S. 856, 106 S.Ct. 163, 88 L.Ed.2d 135 (1985).

### C. The Standards To Determine the Effect of Prejudicial Pretrial Publicity

The standards governing a change of venue ultimately derive from the due process clause of the fourteenth amendment which safeguards a defendant's sixth amendment right to be tried by "a panel of impartial, 'indifferent' jurors." *Irvin*, 366 U.S. at 722, 81 S.Ct. at 1642; *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 551, 96 S.Ct. 2791, 2799, 49 L.Ed.2d 683 (1976). The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere. In such a case, due process requires that the trial court grant defendant's motion for a change of venue. *Rideau*, 373 U.S. at 726, 83 S.Ct. at 1419. The prejudicial effect of pervasive publicity is tested under the presumed prejudice or the actual prejudice standards.

### 1. The Presumed Prejudice Standard

■ Prejudice is presumed when the record demonstrates that the community where the trial was held was saturated with prejudical and inflammatory media publicity about the crime. *Rideau*, 373 U.S. at 726–27, 83 S.Ct. at 1419; *Murphy*, 421 U.S. at 798–99, 95 S.Ct. at 2035; *see also Sheppard v. Maxwell*, 384 U.S. 333, 352–55, 86 S.Ct. 1507, 1516–18, 16 L.Ed.2d 600 (1966). Under such circumstances, it is not necessary to demonstrate actual bias. *Estes*, 381 U.S. at 542–43, 85 S.Ct. at 1632–33; *Mayola v. Alabama*, 623 F.2d 992, 997 (5th Cir.1980), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981) (quoting *United States v. Capo*, 595 F.2d 1086, 1090 (5th Cir.1979), *cert. denied sub nom. Lukefahr v. United States*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980)). The presumed prejudice principle is rarely applicable, *Nebraska Press Ass'n*, 427 U.S. at 554, 96 S.Ct. at 2800, and is reserved for an "extreme situation." *Mayola*, 623 F.2d at 997.

In *Rideau*, the Supreme Court found the facts concerning the media publicity to be sufficiently extreme to invoke the presumed prejudice rule. Rideau confessed to robbing a bank in Calcasieu Parish, kidnapping three of the bank's employees, and killing one of them. 373 U.S. at 723–24, 83 S.Ct. at 1418. This confession was videotaped and subsequently broadcast three times by a local television station. *Id.* at 724, 83 S.Ct. at 1418. At the time, Calcasieu Parish had a population of 150,000. *Id.* At trial, the court denied defendant's motion for a change of venue. *Id.* The Supreme Court held that the denial of the motion to change venue violated the due process clause. *Id.* at 726, 83 S.Ct. at 1419. The Court noted that three jurors who decided the case had seen the televised confession. *Id.* at 725, 83 S.Ct. at 1418. The Court concluded "without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury" that due process required a trial before a community of persons who had not seen the televised confession. *Id.* at 727, 83 S.Ct. at 1419–20. The Court reasoned that the televised confession "*was* Rideau's trial," and "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a

hollow formality." *Id.* at 726, 83 S.Ct. at 1419 (emphasis in original).

■ We have independently reviewed the 136 exhibits introduced at the state court hearing on the motion for a change of venue. These exhibits apparently include every media reference to the Harris matter from July 5, 1978, the date of the homicides, until November 30, 1978, the commencement of jury selection. The exhibits reveal that from July 5, 1978 to July 21, 1978, media interest in this case was at its zenith. We conclude that "the record of publicity in the months preceding, and at the time of, the ... trial does not reveal the 'barrage of inflammatory publicity immediately prior to trial' amounting to a 'huge ... wave of public passion'" to warrant a presumption that the jurors selected for the trial of this matter were prejudiced. *Patton,* 467 U.S. at 1032–33, 104 S.Ct. at 2889 (citations omitted).

The vast majority of the media accounts are largely factual in nature. *Compare Murphy,* 421 U.S. at 802, 95 S.Ct. at 2037 (pretrial publicity not prejudicial because the news articles concerning the defendant "were ... largely factual in nature") *with Sheppard,* 384 U.S. at 338–49, 86 S.Ct. at 1509 (prejudicial media reports were not factual in nature). It is quite true that some of the media reports refer to Harris' prior criminal record, and the alleged confession of each brother. These accounts, however, were published within the two weeks immediately following the homicides. The number of news reports regarding the Harris case had dissipated considerably by the time of jury selection four months later.

Harris also claims "the record of publicity in this case demonstrates repeated acts by state and federal prosecutors releasing inflammatory statements, each publicly vying to outinsure [sic] the other that their jurisdiction would best guarantee appellant's permanent isolation from society." Harris argues that the release of publicity by law enforcement demonstrates the atmosphere surrounding the trial was so inflammatory as to undermine his right to a

fair trial. The record does not support this contention.

Former California Supreme Court Chief Justice Rose Elizabeth Bird, in her dissent in *People v. Harris,* described the public disagreement that occurred between the offices of the United States Attorney and the county district attorney as follows:

About this time, the publicity surrounding this case in San Diego County developed a new aspect, as the two major prosecutorial officers in the county became engaged in a sharp public dispute over which office would "get first crack" at prosecuting appellant. The local United States Attorney's office was responsible for the prosecution of the bank robbery offense, and the county district attorney for the homicides. Each office issued statements indicating what sentence appellant would likely obtain if convicted in its respective court. The United States Attorney claimed that the federal charges were an "insurance policy" against appellant's early release by the parole board. After the district attorney's office responded that it was seeking the death penalty—a punishment not available in the federal courts for bank robbery—the United States Attorney held a televised news conference at which he expressed the opinion that the California death penalty law was unconstitutional.

The district attorney's office took the public position that if the federal charges were tried first, the state might lose the opportunity to try appellant and obtain a death sentence. The district attorney attempted to delay appellant's arraignment in federal court, and members of the office accused the United States Attorney of "political grandstanding." The United States Attorney responded that it was the county prosecutors who were "grandstanding."

When the federal authorities obtained a trial date of October 3, the *Tribune* noted this "tightens the race between the two jurisdictions as to which will be the first to try the case." An assistant district attorney described the "competition" between his office and the federal

prosecutors as an "awkward situation." On August 7, the district attorney was able to have the state trial set on a date earlier than October 3, and the press reported that the district attorney had "moved ahead" in his efforts to "beat federal authorities to the punch in prosecuting the Harris brothers."

Attorneys in the district attorney's office privately told the press that the motivation of the United States Attorney was "politics." They claimed "he is politically ambitious and ... he knows the case will receive a lot of publicity...." The United States Attorney responded that he was merely seeking "maximum protection of the community." Members of the district attorney's office were said to "scoff" at this justification.

On August 10, the *Union* published a lengthy article on the jurisdictional dispute, reporting that a senior federal parole officer "disputed" the United States Attorney's computation of appellant's federal sentence. This official, who calculated a prison term "far under" the term mentioned by the United States Attorney, "cannot understand why [the United States Attorney] is insisting on prosecuting the two brothers from Visalia." County prosecutors were again said to claim that federal involvement was "for the sake of publicity." An assistant legal counsel for the C.R.B. computed for the *Union* that "the least" appellant would serve in state prison would be a term of years well beyond the term calculated by the federal parole officer.

These events were duly reported by the *Union*, the *Times*, the *Evening Tribune*, and by the local television stations over a two and one-half week period from July 20th through August 10th, and beyond.

28 Cal.3d at 969–71, 623 P.2d at 259–60, 171 Cal.Rptr. at 698–99.

These facts do not reveal a "general atmosphere in the community or courtroom [which] is sufficiently inflammatory" to deny Harris a fair trial by impartial jurors. *Murphy*, 421 U.S. at 802, 95 S.Ct. at 2037. The dispute between the two prosecutorial branches focused on the merits of each criminal system in the context of this particular case; the publicized dispute did not involve a prejudgment by either office as to the guilt of Harris which existed in *Silverthorne v. United States*, 400 F.2d 627 (9th Cir.1968), relied upon by Harris. Similarly, the disagreement was relatively short-lived, only spanning a brief two and one-half week period in the early part of the four-month period between the homicides and the voir dire of the jury. Under the "totality of circumstances," *Murphy*, 421 U.S. at 799, 95 S.Ct. at 2036, *Patton*, 467 U.S. at 1031, 104 S.Ct. at 2889, the public dispute between the federal and local prosecution does not warrant a finding of community prejudice sufficiently inflammatory to deny Harris a fair trial.

### 2. Actual Prejudice

To determine whether actual prejudice existed to deny defendant his right to "a panel of impartial, 'indifferent' jurors," *Irvin*, 366 U.S. at 722, 81 S.Ct. at 1642, a court must determine if the jurors demonstrated actual partiality or hostility that could not be laid aside. *Murphy*, 421 U.S. at 800, 95 S.Ct. at 2036. "[J]urors need not, however, be totally ignorant of the facts and issues involved." *Id.* The Court in *Irvin* defined the constitutional level of impartiality required to ensure a fair trial:

> To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

366 U.S. at 723, 81 S.Ct. at 1642–43.

Harris claims the responses of the jurors on voir dire revealed actual prejudice because 79% (81 of 103) of the prospective jurors questioned and 75% (9 of 12) of the petit jury were exposed to pretrial publicity. We disagree. Actual prejudice is not demonstrated by a showing of exposure to

pretrial publicity. "The relevant question is not whether the community remembered the case, but whether the jurors ... had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton,* 467 U.S. at 1035, 104 S.Ct. at 2891 (citing *Irvin,* 366 U.S. at 723, 81 S.Ct. at 1642). The Supreme Court has indicated that a key factor in gauging the reliability of juror assurances of impartiality is the percentage of veniremen who "will admit to a disqualifying prejudice." *Murphy,* 421 U.S. at 803, 95 S.Ct. at 2037. The higher the percentage of veniremen admitting to a previously formed opinion on the case, the greater the concern over the reliability of the voir dire responses from the remaining potential jurors. *Id.*

In *Murphy,* the Supreme Court found that it was not unusual in a highly publicized case to excuse 20 persons from a pool of 78 because they had formed an opinion as to the defendant's guilt. *Id.* at 803, 95 S.Ct. at 2037. Thus, no inference of actual prejudice could be drawn regarding the reliability of assurances of impartiality obtained from the remaining jurors. *Id.*

■ In the instant case, the voir dire examination was conducted by the trial judge and counsel for both parties. It was very thorough and probing into any potential bias exhibited against Harris or knowledge about the case. Any juror who revealed exposure to prejudicial publicity was excused from the case by the court even without a showing that he had formed an opinion as to Harris' guilt. Only 19 persons from a pool of 103 potential jurors were excused because they had formed an opinion as to Harris' guilt. This constitutes an even lower percentage (18%) than was found acceptable in *Murphy* (26%). By contrast, in *Irvin,* where the reliability of juror assurances of impartiality was suc-cessfully challenged, almost 90% of the veniremen (370 of 430) entertained some opinion as to the defendant's guilt, including 8 of the 12 jurors finally placed in the jury box. 366 U.S. at 727, 81 S.Ct. at 1645.

The responses given by the jurors who were sworn to try this matter demonstrate their impartiality.[2] Three jurors had virtually no information about the case. None of the seated jurors indicated they held any preconceived notions regarding Harris' guilt. No actual prejudice to Harris' right to a fair and impartial jury is demonstrated in the voir dire examination.

### D. *Discussions In Jury Lounge*

Harris claims that "hostile" and "intense" discussions in the jury lounge demonstrate actual or presumed prejudice and an impartial jury. While the individual voir dire examination was being conducted in the courtroom, prospective jurors waiting to be interviewed remained in the Jury Commissioner's Office. In the same room were persons summoned as prospective jurors in other criminal and civil matters.

The trial judge admonished all the jurors in this matter not to discuss the case with anyone. On the eighth day of jury voir dire, after 64 jurors had been examined, a juror stated during voir dire that prospective jurors and jurors not involved in the Harris matter were discussing this case. After examining the juror further, the trial judge observed that "all [64] jurors who have been questioned have been frank and honest and we have been getting the benefit of what they really know." Harris' counsel concurred in the court's assessment. Pursuant to Harris' counsel's suggestion, the court admonished the remaining 18 jurors to avoid any discussions in the jury lounge concerning the case.[3] This

2. The voir dire in this case was extensive. It took 13 days to pick 16 jurors from 104 venire persons. *See Patton,* 467 U.S. at 1034 n. 10, 104 S.Ct. at 2890 n. 10 (it took 10 days to pick 14 jurors from 292 venire persons); *Irvin,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (it took 8 days to pick 14 jurors from 430 venire persons).

3. THE COURT: Ladies and gentlemen, I have called you in because we know that the facilities down in the jury room are not too good. I am talking about the Jury Commissioner's office.

There is too much possibility of discussion on the part of those who are not involved in this case concerning this case, and I would ask that you please be very careful in your discussions with anybody, as I have told you during all of these admonitions, and to certainly avoid any discussion that comes from someone who is not involved. I am talking about jurors who are

special cautionary instruction and the extensive and searching voir dire examination of the jury conducted by the court and counsel eliminated any potential for prejudice arising from the jury lounge discussions about the case.

■ Harris' characterization of the jury lounge discussions as "hostile" and "intense" is not supported by the record. Only two of the jurors who served on the petit jury overheard the discussions in the jury lounge. Juror LaValley walked away when he heard a prospective juror mention the Harris trial. Juror Earl only heard that Harris was accused of murder. Harris' trial counsel thoroughly examined both jurors. The jurors' responses did not disclose any bias against Harris. These prospective jurors not selected to serve in this matter who overheard the lounge discussions did not express any hostility or bias toward Harris.

The state trial judge concluded that the responses to the voir dire examination did not demonstrate that there was a reasonable likelihood that the jurors selected to sit on the petit jury could not provide Harris with a fair and impartial determination of the facts. The judge expressed his assessment of this issue in the following language:

> I was impressed with the forthrightness of the jurors. I think the fact that they were interviewed individually and questioned individually even increases the desire on the part of the juror to tell us precisely what their feelings were.... I saw nothing ... in the examination to indicate to me that the jury or in any sense there was a feeling of hostility, that there was antagonism, that there was a knowledge so great as to create an atmosphere that would not allow for a fair trial. As a matter of fact, I think the reverse is true. I am satisfied that the jury that has been selected was very fairly selected.

A state trial court's findings of fact with respect to the prejudicial effect of pretrial publicity are presumed to be correct, 28 U.S.C. § 2254(d); *Chaney v. Lewis*, 801 F.2d 1191, 1194 (9th Cir.1986), *cert. denied*, 481 U.S. 1023, 107 S.Ct. 1911, 95 L.Ed.2d 516 (1987); *Austad*, 761 F.2d at 1354, and will not be set aside unless the error is manifest. *Irvin*, 366 U.S. at 724, 81 S.Ct. at 1643; *Patton*, 467 U.S. at 1031–32 & n. 7, 104 S.Ct. at 2889 n. 7 (applying the "manifest error" standard of *Irvin*). Our independent review of the record amply supports the state trial court's findings that the persons selected as petit jurors were not prejudiced against Harris as the result of the media publicity in this matter. Thus, Harris was not deprived of his right to an impartial jury.

## II. EFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE

Harris contends he was denied effective assistance of counsel at the penalty phase of his trial because his trial counsel failed (1) to present the abnormal results of his 1971 EEG examination as mitigating evidence and (2) to request a third EEG examination. The State contends that we should not reach the merits of Harris' ineffectiveness of counsel claim under Rule 9 of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254 (1982). We first address the State's Rule 9 claims.

### A. *Rule 9(a)*

■ In the district court, the State claimed the court should dismiss Harris' ineffective assistance of counsel claim under Rule 9(a) because it was prejudiced by Harris' four-year delay in asserting this claim. The State claims it was prejudiced by Harris' delay in raising the issue of ineffective assistance of counsel because "in the four years between Harris' conviction and the 'discovery' by present counsel of this issue, the principal witness (trial

---

down there for other cases and who might volunteer information to you and so on.

If any incident does occur in which you are involved in conversation, someone is to involve

you about this case, I want you to be sure and call it to the attention of the Court.

Now, we are going to go forward with our voir dire.

counsel) has become unable to remember whether he considered introducing such evidence at the penalty phase." Harris' trial counsel, Thomas J. Ryan, stated in his declaration in support of this contention of ineffectiveness of counsel, "I did not introduce the abnormal EEG as evidence at the penalty trial. I do not recall that I considered doing so." Because the district court reached the merits of the ineffectiveness of counsel claim and did not address the State's Rule 9(a) claim, we can only conclude that the district court impliedly rejected the State's claim of prejudice.

Rule 9(a) provides:

A petition may be dismissed if it appears that the state of which the respondent is an officer has been prejudiced in its ability to respond to the petition by delay in its filing unless the petitioner shows that it is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred.

Under Rule 9(a), a district court may dismiss a petition for a writ of habeas corpus, or separate grounds stated therein, upon a showing that (1) the state has been prejudiced in its ability to respond to the petition, (2) this prejudice resulted from petitioner's delay, and (3) the petitioner has not acted with reasonable diligence as a matter of law. *Brown v. Maggio*, 730 F.2d 293, 295 (5th Cir.1984) (per curiam). The burden of proof initially lies with the state:

If the State makes a prima facie showing that it has been prejudiced as a result of the petitioner's delay, the burden shifts to the petitioner to show either that the state actually is not prejudiced or that petitioner's delay "is based on grounds of which he could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the state occurred."

*McDonnell v. Estelle*, 666 F.2d 246, 251 (5th Cir.1982) (quoting Rule 9(a)); *Brown*, 730 F.2d at 295.

 The state is prejudiced if the delay forecloses its ability to rebut the petitioner's allegations. Rule 9(a); *Brown*, 730

F.2d at 295. " ' "[D]elay alone is no bar to federal habeas relief...." ' " In order to prevail on a laches claim respondent must make a particularized showing of prejudice" caused by the delay. *Paprskar v. Estelle*, 612 F.2d 1003, 1007–08 (5th Cir.) (citations omitted) (quoting *United States ex rel. Barksdale v. Blackburn*, 610 F.2d 253, 260 (5th Cir.1980), *cert. denied*, 454 U.S. 1056, 102 S.Ct. 603, 70 L.Ed.2d 593 (1981)), *(cert. denied*, 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980)); *McDonnell*, 666 F.2d at 251; Rule 9(a). The ultimate disposition of whether the petitioner used reasonable diligence is "based upon the reasonableness of the party's behavior under the circumstances." *Baxter v. Estelle*, 614 F.2d 1030, 1034 (5th Cir.1980), *cert. denied*, 449 U.S. 1085, 101 S.Ct. 873, 66 L.Ed.2d 810 (1981).

 The State has made a sufficient showing that it has been prejudiced in its ability to respond to the petition because of Harris' delay in asserting the claim. Courts have found prejudice under Rule 9(a) where a delay in bringing a claim is accompanied by the inability of a witness to recall information necessary for the state to respond to the merits of the petition. *See, e.g., Mayola v. Alabama*, 623 F.2d 992, 999 (5th Cir. Unit A 1980) (prejudice found where there was "impairment of the recollections of numerous witnesses"), *cert. denied*, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981); *Bouchillon v. Estelle*, 628 F.2d 926, 929 (5th Cir. Unit A 1980) (prejudice found where "at least two of the witnesses no longer had an independent recollection of the facts of the trial"); *Brown*, 730 F.2d at 295 (prejudice found where judge and defense attorney did not remember petitioner's plea); *Arnold v. Marshall*, 657 F.2d 83, 84 (6th Cir.1981) (per curiam) (prejudice found where defense counsel could not remember specifics of the issue, witness had little recollection of the facts, two of the arresting officers had no recall of the case, and prosecutor had general recollection but no recall of specifics), *cert. denied*, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982); *Moore v. Smith*, 694 F.2d 115, 118 (6th Cir.1982)

(prejudice found where defense counsel had no recollection why direct appeal was not taken), *cert. denied,* 460 U.S. 1044 (1983); *Cotton v. Mabry,* 674 F.2d 701, 705 (8th Cir.) (prejudice found where police, witnesses, and defense counsel had no recollection of trial), *cert. denied,* 459 U.S. 1015, 103 S.Ct. 374, 74 L.Ed.2d 508 (1982); *Bowen v. Murphy,* 698 F.2d 381, 383 (10th Cir.1983) (per curiam) (prejudice found where recollections of judge and prosecutor were very limited). It may be assumed that Ryan would have had a better chance of remembering had this issue been raised earlier. *Brown,* 730 F.2d at 296. The three year delay in raising the claim of ineffective assistance of counsel prejudiced the State.

The next inquiry under Rule 9(a) is whether Harris can demonstrate that he acted with diligence as a matter of law. The State claims that both Harris and his current counsel were not reasonably diligent in proffering this claim. The evidence supports a contrary conclusion.

In April 1982, Michael J. McCabe, Harris' current counsel, stated in his declaration as to the discovery of the facts surrounding the ineffectiveness of counsel claim:

2. Within the past three months, I received a phone call from federal probation officer, Steven Blake, informing me that upon review of his probation file he discovered an electroencephalogram report from Springfield, Missouri. The report reflected that Mr. Harris suffered from organic brain damage, possibly due to chronic glue-sniffing.

3. This was the first time I had been informed of this report. I fully reviewed the court record of the trial proceedings and found no reference to an abnormal EEG test. Although I had numerous conferences with trial counsel, Thomas Ryan, between 1979 and 1982, the abnormal EEG was never raised.

On April 16, 1982, Harris filed his second writ of habeas corpus in the Superior Court for San Diego County raising this claim. In August 1982, after exhausting this claim in state court, Harris filed his second federal petition containing this contention.

Our review of the record reveals that there is nothing in the trial record that would have alerted McCabe or put him on notice of the abnormal EEG report to permit him to include this claim at an earlier date. Thus, the record supports the district court's implied finding that Harris' counsel acted with reasonable diligence. The district court did not abuse its discretion in denying the State's 9(a) claim as to this issue.

**B.** *Rule 9(b)*

The State next claims that Harris' failure to assert the ineffective assistance of counsel claim in his first petition is an abuse of the writ under Rule 9(b) of the Rules Governing Section 2254 cases, 28 U.S.C. foll. § 2254. Rule 9(b) provides in pertinent part: "A second or successive petition may be dismissed if ... new and different grounds are alleged, [and] the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ."

The State argues for the first time on appeal that even if McCabe did not discover the factual underpinnings of the ineffectiveness of counsel claim in time to include it in Harris' first federal petition, the filing of a second federal petition was an abuse of the writ because Harris was aware of the facts upon which the new issues are premised. We do not reach this question because the State did not present this argument to the district court for consideration.

**C.** *Ineffective Assistance Of Counsel*

■ Harris claims his trial counsel's failure to present evidence at the penalty phase of his trial of the 1971 abnormal EEG examination results, and to request an EEG examination at trial constitute ineffective assistance of counsel. The facts do not support this conclusion.

In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the test under which we review claims of ineffective assistance of counsel in capital cases. A petitioner must show both that counsel's performance "fell below an objective stan-

dard of reasonableness" considering "all the circumstances," *id.* at 688, 104 S.Ct. at 2065, and that "there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death," *id.* at 695, 104 S.Ct. at 2069. The Court noted that

> [b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id.* at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Thus, "[j]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Id.* at 700, 104 S.Ct. at 2071. The district court applied the *Strickland* standard and concluded Harris had not demonstrated deficient performance by trial counsel or prejudice.

Harris' trial counsel was aware of the abnormal 1971 EEG showing abnormal results at the *guilt* phase of Harris' trial. He was also aware of a subsequent EEG performed in 1977, only two years before the homicides, which demonstrated *normal* results. Harris' counsel explained that he decided not to use the 1971 EEG results during the guilt phase of Harris' trial because it would have been inconsistent with Harris' alibi defense. He also states that "I did not introduce the abnormal EEG as evidence at the penalty trial. I do not recall that I considered doing so."

These declarations do not overcome the "strong presumption" that Harris' counsel's failure to introduce the 1971 EEG results or to request a third EEG examination fell within "the wide range of reason-able professional assistance...." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. We do not know from this record whether trial counsel concluded that the fact that the most recent EEG was normal might have been harmful to a claim of mitigation based on mental impairment. Because it is possible that the failure to introduce the abnormal EEG results was a difficult but thoughtful tactical decision, we must presume that counsel's conduct was within the range of competency. Because Harris has failed to demonstrate deficient performance, the ineffective assistance of counsel claim must fail.

## III. DENIAL OF A POST–CONVICTION EEG EXAMINATION

■ Harris contends the State of California's denial of his request for a post-conviction EEG examination was arbitrary and violated his right to due process under the fourteenth amendment. Because the State's action did not affect Harris' right to due process at his trial and sentencing, we must reject this argument.

In Harris' June 1982 "Application for Order Permitting a Neurological Examination of Petitioner at San Quentin, etc." filed in the California Supreme Court, Harris' counsel applied for an order permitting an EEG examination of petitioner "to enable petitioner to gather evidence to support his claim of ineffective assistance of trial counsel for failure to move for a pretrial neurological examination to confirm petitioner's organic brain damage." The state supreme court denied the request.

The record does not demonstrate that an EEG examination performed in 1982 would establish Harris' mental condition at the time of trial in 1979, or that it would aid a reviewing court in evaluating whether trial counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Thus, the California Supreme Court's decision to deny Harris' request for a post-conviction EEG examination was not arbitrary or violative of due process.

## IV. "DEATH QUALIFICATION" OF THE JURY

The state trial judge removed for cause, over Harris' objections, prospective jurors who stated that they could not under any circumstances vote for the imposition of the death penalty pursuant to *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Harris contends that the "death-qualification" of the jury by removal for cause of the *"Witherspoon*-excludables" violated his rights under the sixth and fourteenth amendments to the United States Constitution because (1) the resulting jury is prone to convict, (2) it does not constitute a neutral or reliable tribunal, and (3) it does not represent a fair cross-section of the community. The district court rejected this claim and denied Harris an evidentiary hearing on this issue.[4] We initially address the State's assertion that Harris abused the writ under Rule 9(b).

### A. *Abuse of the Writ*

The State contends the district court abused its discretion in denying its request to dismiss Harris' "death qualification" claim under Rule 9(b) because (1) this argument was raised and rejected in his first federal petition, and (2) assuming this argument is new, there is no reason for it not to have been presented in the first petition. Rule 9(b) bars successive petitions where new grounds are alleged and the court finds that failure to assert these arguments in the earlier petition constitutes an abuse of the writ.

Rule 9(b) does not define the phrase "abuse of the writ." However, the legislative history of Rule 9(b) indicates that Congress intended to codify the principles governing abuse of the writ set forth in the leading case of *Sanders v. United States,* 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148

(1963). H.R.Rep. No. 1471, 94th Cong., 2d Sess. at 5–6, *reprinted in* 1976 U.S. Code Cong. & Admin. News 2478, 2482 (quoting *Sanders,* 373 U.S. at 17, 83 S.Ct. at 1078). Thus, we must look to *Sanders* to determine what constitutes an abuse of the writ. *Rose v. Lundy,* 455 U.S. 509, 521, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982) (plurality opinion of O'Connor, J.) ("Rule 9(b) incorporates the judge-made principle governing the abuse of the writ test set forth in *Sanders* "); *id.* at 534, 102 S.Ct. at 1211 (Brennan, J., concurring in part and dissenting in part) (interpretation of Rule 9(b) "necessarily entails an accurate interpretation of the *Sanders* standard").

■ The Court in *Sanders* discussed the abuse of the writ doctrine as follows: if a prisoner *deliberately withholds* one of two grounds for federal collateral relief at the time of filing his first application, in the hope of being granted two hearings rather than one or for some other such reason, he may be deemed to have waived his right to a hearing on a second application presenting the withheld ground.... Nothing in the traditions of habeas corpus requires the federal courts to tolerate needless piecemeal litigation, or to entertain collateral proceedings whose only purpose is to vex, harass, or delay.

373 U.S. at 18, 83 S.Ct. at 1078 (emphasis added); *Richmond v. Ricketts,* 774 F.2d 957, 961 (9th Cir.1985). The proper inquiry then in determining whether a habeas petitioner has abused the writ by failing to raise a claim in a prior habeas petition is "whether he withheld it without legal excuse." *Jones v. Estelle,* 722 F.2d 159, 163 (5th Cir.1983) (en banc), *cert. denied sub nom. Jones v. McKaskle,* 466 U.S. 976, 104 S.Ct. 2356, 80 L.Ed.2d 829 (1984). Legal

---

**4.** After Harris filed a notice of appeal to challenge this ruling, he moved this court on November 12, 1985, to recalendar oral argument in this case pending the decision of the Supreme Court in *Lockhart v. McCree. Lockhart* involved the issue of the "death qualification" of a jury. On January 16, 1986, this court vacated the setting of oral argument pending the Supreme Court's decision in *Lockhart v. McCree.* On May 5, 1986, the Supreme Court decided *Lockhart v.*

*McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). Harris' case was recalendared for oral argument to November 5, 1986.

Both parties have filed supplemental briefs addressing the applicability of *Lockhart.* The NAACP Defense and Educational Fund, Inc. filed an *amicus curiae* brief devoted solely to the "death qualification" issue in support of Harris' contentions.

excuse is demonstrated when, for example, new facts have arisen since the prior petition which were not reasonably ascertainable at the time of the filing of the earlier petition, or the law has changed in some substantive manner in the interim. *Id.* at 165, 169.

In rejecting the State's Rule 9(b) claim, the district court stated:

> Harris' contention that death qualified juries do not represent a fair cross section of the community was presented in his first petition and rejected by this court. *Petition I, 82–0249* at 93–95. The other two prongs of the death qualification argument were not exhausted at the state level when Harris filed his first petition in March 1982. Harris risked dismissal of his entire petition had he included unexhausted claims with exhausted arguments. *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982); *Powell v. Spalding,* 679 F.2d 163, 166, n. 2 (9th Cir.1982).

▌ We review *de novo* whether a claim was exhausted in state court. *Kim v. Villalobos,* 799 F.2d 1317, 1320 (9th Cir. 1986). "A state prisoner seeking federal habeas corpus review of his conviction ordinarily must first exhaust available state remedies." *Id.* at 1319; 28 U.S.C. § 2254(b), (c).

▌ Our independent review of the record reveals the district court's conclusion is not supported by the record. Harris had exhausted his state remedies as to *all* three prongs of his "death qualification" argument when the California Supreme Court denied his petition for a writ of habeas corpus on October 10, 1980, prior to the filing of his federal petition on March 5, 1982. Harris' state petition raised all three prongs:

> The excusal for cause of jurors who, while unalterably opposed to the imposition of the death penalty, can nevertheless fairly determine the guilt or innocence of the defendant, denied petitioner a fair trial by an impartial jury on the issues of his guilt or innocence, the degree of his offense if guilty, and the truth or untruth of the special circumstances alleged. The process of excluding prospective jurors for cause based on opposition to the death penalty (i.e., "death qualification") in a situation where, as here, a single jury heard both the guilt and penalty phases of petitioner's bifurcated trial renders that jury impermissibly prosecution-prone, more likely to convict than a jury which is properly representative of a cross-section of the community and incapable of functioning as an impartial and effective safeguard of petitioner's rights guaranteed by state and federal constitutional provisions.

Thus, Harris' claim that he had not exhausted state post conviction proceedings on this issue is without merit.

▌ Alternatively, Harris asserts that he did not abuse the writ under Rule (b) because he has acquired "newly developed scientific evidence" on the death qualification issue which was not available when he filed his first federal petition. This argument is supported by the record.

In Harris' first state petition for a writ of habeas corpus filed concurrently with his automatic appeal to the California Supreme Court, Harris incorporated the statistical evidence proffered in *Hovey v. Superior Court,* 28 Cal.3d 1, 616 P.2d 1301, 168 Cal.Rptr. 128 (1980), a capital case then pending in the California Supreme Court, with his death qualification claim. One of the reasons the California Supreme Court rejected Harris' "death qualification" claim was that the statistical evidence he relied upon did not take into "consider[ation] the differences between a '*Witherspoon*–qualified' jury and a 'California death-qualified' jury." *Hovey,* 28 Cal.3d at 69, 616 P.2d at 1346, 168 Cal.Rptr. at 174; *see Harris,* 28 Cal.3d at 960, 623 P.2d at 253, 171 Cal. Rptr. at 692–93 (Harris' death qualification claim was based on *Hovey* ). Harris explains that after he filed his first federal petition on March 5, 1982, his attorney McCabe became aware of new statistical evidence presented in the capital case *People v. Word and Sparks,* S.F. No. 14376, on this issue. Harris asserts that the "newly developed scientific evidence"

presented during the *Word and Sparks* proceedings takes into consideration the "California death-qualified" jury. The State has not offered evidence that this material was not "newly developed." Because of Harris' showing that he has discovered evidence not reasonably ascertainable at the time of his first federal petition, the district court did not abuse its discretion in rejecting the State's Rule 9(b) abuse of the writ claim.

B. *Propriety of Exclusion of "Witherspoon-excludables" from the Petit Jury*

In *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court held that the United States Constitution does not "prohibit the removal for cause, prior to the guilt phase of a bifurcated capital trial, of prospective jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial." *Id.* at 165, 106 S.Ct. at 1760. The Court rejected the defendant's contention that "death qualification" of the jury violated his right under the sixth and fourteenth amendments to an impartial jury selected from a representative cross section of the community. *Id.* at 173–77, 183–84, 106 S.Ct. at 1764–67, 1769–70. Harris has advanced many of the same arguments the Supreme Court expressly rejected in *McCree.*

As the Supreme Court recently noted, "[t]here is no reason to revisit the issue whether social-science literature conclusively shows that 'death-qualified' juries are 'conviction-prone.'" *Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 2913 n. 16, 97 L.Ed.2d 336 (1987). Just as it was assumed in *McCree* and *Buchanan* that the studies presented in those cases were "both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries," *McCree,* 476 U.S. at 173, 106 S.Ct. at 1764; *Buchanan,* 107 S.Ct. at 2913 n. 16, we make a similar assumption here concerning similar studies presented by Harris.

The Supreme Court's reasoning in *McCree* requires rejection of Harris' contention that "death qualification" violated his right to a jury selected from a representative cross-section of the community. The fair cross-section requirement does not apply to petit juries. The fair cross-section rule is limited to the method of summoning the venire panel from which the petit jury is selected. *McCree,* 476 U.S. at 173–74, 106 S.Ct. at 1764–65. No violation of the sixth amendment's fair cross-section requirement has been shown in this matter.

The analysis in *McCree* also forecloses Harris' claim that the removal of *"Witherspoon*-excludables" resulted in the selection of a conviction-prone jury. The Court in *McCree* stated that even though " 'death qualification' in fact produces juries somewhat more 'conviction prone' than 'non-death-qualified' juries.... the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." 476 U.S. at 173, 106 S.Ct. at 1764.

Harris finally claims that "death qualification" denied him a "jury capable of fulfilling functions contemplated by the right to a jury trial." Harris asserts that "death qualification" results in a jury which is "less likely to overcome the biases of its members or to arrive at an accurate and objective result through the counterbalancing of the prejudices and proclivities of individual jurors." This argument is merely a restatement of Harris' fair cross-section argument. *Accord Smith v. Balkcom,* 660 F.2d 573, 584 & n. 29 (5th Cir. Unit B 1981) (defendant's claim that "death qualification" denies him his right to a properly functioning jury is "simply another way of claiming that the jury which convicted him was not fairly representative of the community"), *modified,* 671 F.2d 858 (5th Cir. 1982) (per curiam).

V. DISCRIMINATORY APPLICATION OF THE DEATH PENALTY

Harris contends the district court erred in denying his requests for discovery and an evidentiary hearing in order to prove his allegations that the California death penal-

ty statute violates his right to equal protection under the fourteenth amendment and the eighth amendment prohibition against cruel and unusual punishment because it is applied discriminatorily against defendants convicted of murdering whites, and against males between 25 and 34 years of age.

### A. *District Court's Compliance With This Court's Prior Decision*

■ Harris initially contends that this court ordered the district court to conduct an evidentiary hearing upon remand in *Harris I.* Harris misconstrues our prior opinion. In our prior opinion, we stated in reference to Harris' discrimination claims:

> We do not believe that the State accorded Harris a full and fair hearing on these constitutional claims. Although we do not decide whether Harris has a right to a hearing in federal court under *Pierce [v. Cardwell,* 572 F.2d 1339, 1340–41 (9th Cir.1978)], we believe that the district court should, if it becomes necessary, provide an opportunity to develop the factual basis and arguments concerning the race-discrimination and gender-discrimination claims.

692 F.2d at 1197. We also held that Harris' conclusory allegations in his age discrimination claim were insufficient "to obtain a hearing in federal court.... absent some stronger showing." *Id.* at 1199.

Our order that an opportunity to develop the evidence "if it becomes necessary," left the decision to the district court whether an evidentiary hearing would be required. *See Shaw v. Martin,* 733 F.2d 304, 313 (4th Cir.) (defendant was not entitled to an evidentiary hearing on his contention that South Carolina's death penalty statute was discriminatorily applied because "[t]he proffered evidence would not have been of sufficient probative value on the issue of discriminatory intent to have required response, and no evidentiary hearing was therefore required") (citing *United States*

*v. Duncan,* 598 F.2d 839, 869 (4th Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979)), *cert. denied,* 469 U.S. 873, 105 S.Ct. 230, 83 L.Ed.2d 159 (1984). The district court, on remand, permitted Harris to submit updated statistical studies and declarations on his discrimination allegations. It was under no compulsion from this court to hold an evidentiary hearing.

### B. *Denial of the Request for Discovery and an Evidentiary Hearing*

■ Harris moved for discovery under Rule 6(a) of the Rules Governing Section 2254 Cases, 28 U.S.C. foll. § 2254 (1982). Rule 6(a) provides for discovery in habeas corpus proceedings "if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Harris' request for discovery was made in conjunction with his request for an evidentiary hearing on his discrimination claims.

In his discovery motion, Harris presented statistical data analyzed by Dr. James Cole "refer[ring] to convictions and death sentences stemming from homicides occurring in California in years 1978–1982." Cole's preliminary findings indicate that "someone whose victim was white had a probability of ultimately receiving the death penalty approximately five times as large as that for someone whose victim was nonwhite." Further, a male between the ages of 25 to 34 stands a significantly greater chance than other defendants of receiving the sentence of death. Based on these preliminary findings, Harris moved for an order compelling the State to produce substantial data from the California courts, including age, race and gender data of victim and defendant in each homicide prosecution in the State of California since 1977, and all transcripts of all California penalty trials relating to "offenses committed on or after" 1977.[5]

---

**5.** Harris' motion for discovery requested the State to provide the following information:

1. The defendant's name, case number, and county of venue of each homicide prosecution for an offense occurring on or after August 11, 1977, in which any special circumstance

was alleged, and which resulted in at least one conviction of murder in the first or second degree or manslaughter.

2. The defendant's name, case number, and county of venue of each homicide prosecution for an offense occurring on or after August

To be entitled to an evidentiary hearing, Harris must demonstrate that (1) "he has alleged facts which, if proved, would entitle him to relief, and (2) an evidentiary hearing is required to establish the truth of his allegations." *Harris I,* 692 F.2d at 1197 (citing *Pierce,* 572 F.2d at 1340–41); *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963). The district court did not grant Harris' motion for discovery or request for an evidentiary hearing because it held that, even assuming the truth of Harris' factual statistical allegations, his discrimination claims failed.

An evidentiary hearing would be necessary to hear any evidence that a *particular* defendant was discriminated against because of his race, age, or gender. But as we discuss in the next section of this opinion, general statistical studies of the kind offered here do not prove discrimination. Moreover, it is not necessary to conduct a full evidentiary hearing as to studies which do nothing more than show an unexplainable disparity.

C. *Applicability of McCleskey v. Kemp*

Last term, the Supreme Court in *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987), considered the use of statistical studies to prove discriminatory treatment. Because Harris' discrimination claims are quite similar to the defendant's

contentions in *McCleskey,* we discuss the Supreme Court's decision in some detail.

In *McCleskey,* the defendant contended the Georgia capital sentencing process was administered in a racially discriminatory manner in violation of the eighth and fourteenth amendments to the United States Constitution. *Id.* 107 S.Ct. at 1763. In support of his claim, the defendant proffered a statistical study that purported to show a disparity in the imposition of the death sentence in Georgia based on the race of the murder victim and, to a lesser extent, the race of the defendant. The statistical study examined over 2,000 murder cases which occurred in Georgia during the 1970s. The raw data indicated that defendants charged with killing white persons received the death penalty in 11% of the cases, but defendants charged with killing blacks received the death penalty in only 1% of the cases. The studies also examined the relationship between the race of the defendant and the victim.

The data was subjected to an "extensive analysis" taking into account 230 variables that could have explained the disparities on nonracial grounds. *Id.* at 1764. One of the models concluded that "even after taking account of 39 nonracial variables, defendants charged with killing white victims were 4.3 times as likely to receive a death

---

11, 1977, in which no special circumstance was alleged, but which resulted in (1) a conviction for murder in the first or second degree or manslaughter, and (2) a conviction for any felony enumerated in Penal Code Section 190.1(a)(17)—robbery, kidnapping, rape, sodomy, child molesting, oral copulation, burglary, arson, or train wrecking.

3. The defendant's name, case number, county of venue of each homicide prosecution for an offense occurring on or after August 11, 1977, in which no special circumstance was alleged, but which resulted in at least one conviction for first degree murder and at least one other conviction for at least second degree murder.

4. For each case listed in the response to (1) above, the age, race and gender of each defendant, and the age, race, and gender of each decedent.

5. For each case listed in the response to (2) above, the age, race and gender of each defendant; and the age, race and gender of each decedent.

6. For each case listed in the response to (3) above, the age, race and gender of each defendant; and the age, race and gender of each decedent.

7. Petitioner requests that respondent make available for inspection and copying the computer tape computed by the California Department of Justice, Bureau of Criminal Statistics, containing information about all homicides in California occurring on or after August 11, 1977.

8. Petitioner requests that respondent make available for inspection and copying the transcripts of all California penalty trials relating to offenses committed on or after August 11, 1977.

Petitioner further requests permission to obtain an expert to be appointed by the Court to analyze and report on the data described above, and to present the results of this analysis and report in support of an evidentiary hearing to establish the substance of petitioner's arbitrariness and discrimination claims.

sentence as defendants charged with killing blacks." *Id.*

In analyzing the defendants eighth and fourteenth amendment challenges, the Court "assume[d] the study is valid statistically without reviewing the factual findings of the District Court." *Id.* at 1766 n. 7. The assumption that the studies were valid did not include the assumption that the studies showed that racial considerations actually entered into any sentencing decisions in Georgia, but only demonstrated a "*risk* that the factor of race entered into some capital sentencing decisions and a necessarily lesser risk that race entered into any particular sentencing decision." *Id.* (emphasis in original).

### 1. Proof of Purposeful Discrimination

 The Court reiterated that "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'," *id.* at 1766 (quoting *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967)) (footnote omitted), and that "the purposeful discrimination 'had a discriminatory effect' on him," 107 S.Ct. at 1766 (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 1531, 84 L.Ed.2d 547 (1985)). Thus, the Court held, "to prevail under the Equal Protection Clause, McCleskey must prove that the decisionmakers in *his* case acted with discriminatory purpose." 107 S.Ct. at 1766 (emphasis in original). McCleskey had offered no evidence that would support an inference that racial consideration played a part in *his* sentence, but instead relied on statistical studies, arguing the studies compelled an inference that his sentence rests on purposeful discrimination. *Id.* at 1767. McCleskey had argued that the statistics were "sufficient proof of discrimination, without regard to the facts of a particular case...." *Id.*

The Court noted that it had accepted statistics as proof of intent in certain limited contexts, e.g., equal protection violation in selection of the jury venire in a particular district and in the form of multiple regression analysis to prove statutory violations under Title VII, *id.* at 1767, but "the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII case." *Id.* 1767–68. The important differences between the cases in which the Court has accepted statistics as proof of discriminatory intent is that, in the venire-selection and Title VII contexts, (1) "the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions," and (2) "the decisionmaker has an opportunity to explain the statistical disparity." *Id.* at 1768 (footnotes omitted). Because implementing criminal laws against murder necessarily involves discretionary judgment, the Court stated that it "would demand exceptionally clear proof before we would infer that the discretion has been abused." *Id.* at 1769. The Court held:

> The unique nature of the decisions at issue in this case also counsel against adopting such an inference from the disparities indicated by the Baldus study. Accordingly, we hold that the Baldus study is clearly insufficient to support an inference that any of the decisionmakers in McCleskey's case acted with discriminatory purpose.

*Id.*

In the matter before us, Harris proffered a statistical study performed by James Cole which purports to show a disparity in the imposition of the death sentence in California based on the race of the murder victim. Both murder victims in this case were white. Harris is also white. The Cole study is actually two statistical studies that examine 238 cases which resulted in the penalty of death involving intentional homicides and robbery homicides in California from 1978 to 1982. The raw numbers analyzed by Cole indicated that murders involving white victims accounted for 76.5% of all death sentences for intentional homicides in California. By contrast, only 38.7% of the intentional homicides committed at that time involved white victims. Cole concluded that someone whose victim was white had a five times greater possibil-

ity of receiving the death penalty than someone whose victim was nonwhite.

In the second study involving robbery homicides, Cole indicated that crimes involving white victims accounted for 73% of all death sentences in California. By contrast, only 46.5% of the robbery homicides committed involved white victims. Cole concluded that someone committing robbery murder on a white victim had approximately three times the possibility of ultimately receiving the death sentence as someone committing the crime on a nonwhite victim.

As to the gender discrimination claim, Harris submitted declarations showing that in California between 1978 and 1982, 2,179 persons were convicted of murder, of which only approximately 94, or 4.3%, were female. Of the 144 persons sentenced to death during that period, none were female. Harris' expert witness concluded the total exclusion of women from the pool of those defendants receiving the death sentence is indicative of gender influencing the sentencing process.

As to the age discrimination claim, Harris submitted affidavits by Dr. Cole showing that in California between 1981 and 1982, the number of persons in the 25 to 29 and 30 to 34 year age groups were disproportionately higher than those defendants receiving the death sentence. Dr. Cole relied on the following comparisons:

| Age Group | Death Sentence Recipients in Age Group | Persons Arrested for Murder in Age Group |
|---|---|---|
| 20–24 | 20.2% | 33.4% |
| 25–29 | 35.1 | 25.4 |
| 30–34 | 31.1 | 16.4 |
| 35–39 | 6.8 | 9.1 |
| 40 + | 6.8 | 15.7 |
| Total | 100.0% | 100.0% |

Harris' statistical proffer of evidence, even assuming the truth of his allegations, does not entitle him to an evidentiary hearing or discovery on his equal protection claim. Harris has not demonstrated that the decisionmakers in his case acted with discriminatory purpose on the basis of the

race of his two victims, his gender or age. Harris' statistical evidence does not provide "exceptionally clear proof" that the jury in his case abused its discretion in recommending the sentence of death. In *McCleskey*, the defendant's study revealed that someone charged with killing a white victim was 4.3 times as likely to receive a death sentence as a defendant charged with killing a black victim. Harris' study only reveals a marginally higher ratio, i.e., five times as likely.

As to Harris' gender discrimination claim, Harris' statistics show that while 94 women, or 4.3%, were convicted of murder during this time period, none of the 144 persons sentenced to death during this period were female. These statistics fail to demonstrate if any of the 94 women (1) committed crimes which permitted their execution, or (2) were eligible for the death sentence.[6] "Other than the mere fact that there are no women on death row, there is nothing to support the claim that women are not there because of discrimination." *Richmond v. Ricketts*, 640 F.Supp. 767, 802 (D.Az.1986). These statistical flaws are fatal to Harris' claim. Not only did his statistics not entitle him to discovery or an evidentiary hearing on this claim, but they do not present the "exceptionally clear proof" required to demonstrate purposeful discrimination.

Harris' age discrimination claim likewise suffers from an inadequate showing. The statistical differences are legally insufficient to support his age discrimination claim. Accordingly, we hold that the Cole study is clearly insufficient to support an inference that any of the decisionmakers in Harris' case acted with discriminatory purpose. Harris was not entitled to an evidentiary hearing or discovery.

### 2. Eighth Amendment Claim

■ Harris next contends that the California capital sentencing system is arbi-

---

**6.** In California, the legislature has limited the imposition of the death penalty to a small subclass of homicides. A defendant is only eligible for the death penalty *if* the jury finds (1) the defendant guilty of first degree murder, Cal.

Penal Code §§ 190.1(a), (b), 190 (1977), *and* (2) at least one "special circumstance" which the prosecution charged to be true, *id.* at § 190.2(a)-(c).

trary and capricious in *application* in violation of the eighth amendment prohibition against cruel and unusual punishment because racial, age and gender considerations may influence capital sentencing decisions in California. The Supreme Court rejected a similar claim in *McCleskey*, 107 S.Ct. at 1775.

The Court noted that the Baldus study, similar to but more complex than the Cole study before us, did not *prove* that race enters into any capital sentencing decisions or that race was a factor in McCleskey's particular case. *Id.* The Court explained that "[s]tatistics at most may show only a likelihood that a particular factor entered into some decisions. There is, of course, some risk of racial prejudice influencing a jury's decision in a criminal case. There are similar risks that other kinds of prejudice will influence other criminal trials." *Id.* The inquiry becomes " 'at what point [does] that risk become constitutionally unacceptable.' " *Id.* (quoting *Turner v. Murray*, 476 U.S. 28, 36 n. 8, 106 S.Ct. 1683, 1688 n. 8, 90 L.Ed.2d 27 (1986)). The Supreme Court in *McCleskey* held that the Baldus study did not demonstrate the "constitutional measure of an unacceptable risk" of racial prejudice. 107 S.Ct. at 1775.

The Court reasoned that "a capital sentencing jury representative of a criminal defendant's community assures a ' " 'diffused impartiality' " ' in the jury's task of 'express[ing] the conscience of the community on the ultimate question of life or death.' " *Id.* at 1776 (citations omitted) (footnote omitted). Acknowledging that the Baldus study at most indicates "a discrepancy that appears to correlate with race," *id.* at 1777, the Court stated that "[a]pparent disparities in sentencing are an inevitable part of our criminal justice system" because "any mode for determining guilt or punishment 'has its weaknesses and the potential for misuse.' " *Id.* at

1777–78 (citations omitted) (footnote omitted). The Court then held:

> Despite these imperfections, our consistent rule has been that *constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible."* Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious. In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the Baldus study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital-sentencing process.... [¶] The Constitution does not require that a State eliminate any demonstrable disparity that correlates with a potentially irrelevant factor in order to operate a criminal justice system that includes capital punishment.

*Id.* at 1778, 1781 (emphasis added) (citation omitted) (footnote omitted). With these principles of law in mind, we analyze Harris' eighth amendment claim.

The Cole study does not prove that the factors of race, gender or age entered into any capital sentencing decision in California or that these elements were factors in Harris' particular case. At most, the Cole study demonstrates a discrepancy that may correlate with the race of Harris' victims, Harris' gender and age. California's capital sentencing system does not contain the systemic arbitrariness and capriciousness in the imposition of capital punishment found in statutory schemes invalidated by *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In *Pulley v. Harris*, the Supreme Court examined California's capital sentencing statute.[7] The

---

**7.** The Supreme Court explained, in detail, California's 1977 capital sentencing statute:

> Under this scheme, a person convicted of first-degree murder is sentenced to life imprisonment unless one or more "special circumstances" are found, in which case the punishment is either death or life imprisonment

without parole. Cal. Penal Code Ann. §§ 190, 190.2 (West Supp.1978). Special circumstances are alleged in the charging paper and tried with the issue of guilt at the initial phase of the trial. At the close of evidence, the jury decides guilt or innocence and determines whether the special circumstances alleged are

Court held that "this system, without any requirement or practice of comparative proportionality review, cannot be successfully challenged under *Furman* and our subsequent cases." 465 U.S. at 53, 104 S.Ct. at 881. Thus, we hold that the Cole study does not demonstrate a constitutionally significant risk of racial, gender or age bias affecting the California capital sentencing process.

## VI. FAILURE TO GIVE PROPER INSTRUCTION ON AGE DISCRIMINATION

■■■ Harris also contends that the death sentence was arbitrarily imposed as a result of the "uniquely ambiguous" provisions of California's capital sentencing statute, Cal. Penal Code § 190.3(h) (1977), because the statute permits arbitrary consideration of a defendant's age as an aggravating factor. Harris argues that section 190.3(h) is discriminatory and arbitrary because it permits age to be considered by the jury in balancing the aggravating and

mitigating factors without labeling it either as aggravating or mitigating. The State argues that we should not consider this issue because Harris did not present this claim of instructional error in either his first or second federal petition nor was this issue exhausted on direct appeal or in post-conviction proceedings in the California court system.

A state prisoner who seeks relief under 28 U.S.C. § 2254 must provide the state courts a fair opportunity to correct any federal constitutional error committed in the trial court. *Picard v. Connor,* 404 U.S. 270, 275–276, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971); *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (per curiam). Thus, "the habeas petitioner must have 'fairly presented' to the state courts the 'substance' of his federal habeas corpus claim." *Anderson,* 459 U.S. at 6, 103 S.Ct. at 277. "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was

present. Each special circumstance must be proved beyond a reasonable doubt. § 190.4(a). If the jury finds the defendant guilty of first-degree murder and finds at least one special circumstance, the trial proceeds to a second phase to determine the appropriate penalty. Additional evidence may be offered and the jury is given a list of relevant factors. § 190.3. "After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole." *Ibid.* If the jury returns a verdict of death, the defendant is deemed to move to modify the verdict. § 190.4(e). The trial judge then reviews the evidence and, in light of the statutory factors, makes an "independent determination as to whether the weight of the evidence supports the jury's findings and verdicts." *Ibid.* The judge is required to state on the record the reasons for his findings. *Ibid.* If the trial judge denies the motion for modification, there is an automatic appeal. §§ 190.4(e), 1239(b). The statute does not require comparative proportionality review or otherwise describe the nature of the appeal. It does state that the trial judge's refusal to modify the sentence "shall be reviewed." § 190.4(e). This would seem to include review of the evidence relied on by the judge. As the California Supreme Court has said, "the statutory requirements that the jury

specify the special circumstances which permit imposition of the death penalty, and that the trial judge specify his reasons for denying modification of the death penalty, serve to assure thoughtful and effective appellate review, focusing upon the circumstances present in each particular case." *People v. Frierson,* 25 Cal.3d 142, 179, 599 P.2d 587, 609 (1979). That court has reduced a death sentence to life imprisonment because the evidence did not support the findings of special circumstances. *People v. Thompson,* 27 Cal.3d 303, 165 Cal.Rptr. 289, 611 P.2d 883 (1980).

By requiring the jury to find at least one special circumstance beyond a reasonable doubt, the statute limits the death sentence to a small subclass of capital-eligible cases. The statutory list of relevant factors, applied to defendants within this subclass, "provide[s] jury guidance and lessen[s] the chance of arbitrary application of the death penalty," 692 F.2d, at 1194, "guarantee[ing] that the jury's discretion will be guided and its consideration deliberate," *id.,* at 1195. The jury's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg,* 428 U.S., at 189. Its decision is reviewed by the trial judge and the State Supreme Court. *Pulley v. Harris,* 465 U.S. at 51–53, 104 S.Ct. at 879–80 (footnotes omitted).

made." *Id.* (citations omitted). The Supreme Court recently stated:

> Because "it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation," federal courts apply the doctrine of comity, which "teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter."

*Rose,* 455 U.S. at 518, 102 S.Ct. at 1203 (quoting *Darr v. Burford,* 339 U.S. 200, 204, 70 S.Ct. 587, 590, 94 L.Ed. 761 (1950)).

### A. *Federal Habeas Corpus Petitions.*

Harris claims that the issue of instructional error concerning age discrimination was "clearly raised in the first federal habeas corpus petition, and the only new aspect of the claim is the empirical support for it which has become apparent from the accumulated experience of capital sentencing in California." The record does not support this assertion.

In Harris' Appellant's Opening Brief filed in this court, he contended he "was rendered unable to pursue his separate argument that, apart from endemic age discrimination, California's unique and open-end specification of age as a penalty factor permits particular juries to arbitrarily and capriciously turn a defendant's age *against him* in the capital sentencing process." (Emphasis in original). Harris claims he was unable to pursue this "argument" because the district court did not permit an evidentiary hearing on this issue.

It does not appear from the record that Harris requested an evidentiary hearing on this issue. Thus, he did not properly preserve this issue for appeal to this court. Moreover, he was not entitled to an evidentiary hearing to present a purely *legal* argument. An evidentiary hearing is to present disputed facts.

The district court provided Harris an opportunity to brief the issues raised in his petition, including his age discrimination claim. In response, Harris presented arguments in support of his age discrimination claims under the eighth and fourteenth amendments, but did not argue that section 190.3(h) is arbitrary because age is not labeled either as an aggravating or mitigating factor. Harris admits he did not raise this precise issue in the district court.

We ordered Harris and the State to file supplemental briefs and to attach relevant exhibits to demonstrate wherein Harris raised this issue in his state and federal proceedings. In Harris' supplemental brief, he asserts that he raised this issue in both state and federal court. However, as we demonstrate below, this claim finds no support in the record.

### B. *No Exhaustion In The State Court Proceedings.*

Harris claims he raised this issue on direct appeal to the California Supreme Court. Specifically, Harris points to arguments presented in his Appellant's Opening Brief before that court at pages 164, 166 and 167. In his Supplemental Brief, Harris states:

> [A]ppellant raised the issue of 'the need for (1) objective, unambiguous standards to guide and to channel the sentencing authority's discretion' (Appellant's Opening Brief, p. 164 ... [paragraph]
> Specifically, appellant complained that although:
> ... section 190.3 directs that the jury take into account what is termed 'aggravating' and 'mitigating' circumstances, the jury is never advised which factors listed in the statute fall into one category or the other. (See CALJIC Nos. 8.88.1, 8.89.) ...

This argument, however, is not the same contention Harris now raises on appeal. Furthermore, we addressed this question in *Harris I.* In *Harris I,* we stated:

> Nor do we think that the statute's failure to label factors as aggravating or mitigating invalidates the statute. The Supreme Court has previously upheld the statute that did not explicitly identify factors as aggravating or mitigating but

merely asked the jury to answer several particular questions. Because the California statute establishes factors to guide the jury's discretion and allows for consideration of the particular aggravating and mitigating circumstances in this case, the statute is not unconstitutional in this respect.

692 F.2d at 1194 (citation omitted).

Harris next contends he raised the instructional error issue in state post-conviction proceedings. Specifically referring to Section I of his state habeas corpus petition at page 3, Harris argues:

the pertinent portions of the petition set forth the claims that appellant's age was used as an aggravating factor by the jury in violation of the Eighth and Fourteenth Amendments. Appellant alleged that the statute 'failed to limit and direct sentencing discretion'.

The issue actually presented in his state habeas corpus petition reads as follows:

PETITIONER'S DEATH SENTENCE MUST BE REVERSED BECAUSE THE CALIFORNIA DEATH PENALTY PROVISIONS FAIL TO LIMIT AND DIRECT SENTENCING DISCRETION AND FAILED TO AFFORD MEANINGFUL APPELLATE REVIEW, IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

The argument that the statute is unconstitutional because it fails to limit and direct the sentencing discretion is not the same contention on appeal before us, namely that there was instructional error as to age as an arbitrary factor. The issue in fact presented to the state court was rejected in *Harris I.*

## VII. NONSTATUTORY PENALTY PHASE JURY INSTRUCTION

Under California's 1977 capital sentencing statute, a jury is given an instruction in the penalty phase of the trial which contains ten aggravating and mitigating factors it shall "consider, take into account and be guided by" in deciding whether to impose death or life imprisonment prison without the possibility of parole.[8] Cal. Penal Code § 190.3(a)-(j) (1977). The statute does not identify or describe these factors as aggravating or mitigating. *Pulley v. Harris,* 465 U.S. at 52 n. 14, 104 S.Ct. at 880 n. 14. The trial court in this case modified the standard instruction, California Jury Instructions, Criminal No. 8.88.1, containing these factors, and admonished the jury to consider the defendant's "character, background, history, mental condition and physical condition."

On appeal, Harris contends the use of these nonstatutory factors violated his federal constitutional rights to due process and the prohibition against cruel and unusual punishment. He argues that these

---

**8.** Section 190.3 provides the following factors:

In determining the penalty the trier of fact shall take into account any of the following factors if relevant:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to § 190.1.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

(c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(f) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects of intoxication.

(h) The age of the defendant at the time of the crime.

(i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

factors (1) do not genuinely narrow the class of persons eligible for the death penalty, and (2) do not reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. He asserts further that these factors should actually militate in favor of a lesser penalty. He also contends that these factors are so unconstitutionally broad and vague in their meaning and limitless in their application that they do not provide a sentencing standard capable of promoting a consistent and rational application of the death penalty. The State asks that we decline to review this issue under Rule 9(b).

## A. *Insufficient Showing of Abuse of the Writ*

■■■ The State argued before the district court that the alleged instructional error should not be adjudicated because Harris abused the writ under Rule 9(b). The district court reached the merits of Harris' claim, and thus impliedly rejected the State's Rule 9(b) argument. On appeal, the State claims Rule 9(b) provides "an independently sufficient reason to affirm the District Court's rejection of this claim."

The State contends Harris abused the writ under Rule 9(b) because he did not raise this issue in his first petition. The State asserts that Harris' excuse for not presenting this claim in his first federal petition—"the claim was not raised in petitioner's previous section 2254 petition due to neglect or ineffectiveness of petitioner's previous appointed appellate counsel [Michael McCabe]"—is not sufficient to permit the district court to consider the merits of the claim. Harris' counsel responds that he did not withhold the claim for any tactical reason, but merely "because he missed it."

The determination whether to deny a hearing or dismiss a petition is reviewed for abuse of discretion. *Sanders,* 373 U.S. at 18, 83 S.Ct. at 1078.

In *Richmond,* we recently addressed the procedure that is applicable where a state prisoner raises new claims in a second petition under section 2254. 774 F.2d at 960–61. We explained the appropriate three-part standard to apply in determining whether there is an abuse of the writ under Rule 9(b):

> Previously unadjudicated claims must be decided on the merits unless [1] the petitioner has made a conscious decision deliberately to withhold them, [2] is pursuing "needless piecemeal litigation," or [3] has raised the claims only to "vex, harass, or delay."

*Id.* at 961 (citations omitted).

There is no affirmative indication in the record, and the State does not claim, that Harris' counsel made a conscious decision deliberately to withhold this contention, to proceed by piecemeal litigation, to vex or harass the court or State, or to delay the proceedings. Thus, Harris' second federal petition did not constitute an abuse on this claim.

## B. *Validity of the District Court's Determination of the Merits Of Harris' Claim*

We begin our analysis of Harris' contentions concerning the alleged instructional error looking to applicable California statutes for guidance concerning the evidence the jury can consider in selecting the proper punishment in a capital case. The introductory paragraph of section 190.3 explains the wide range of evidence that is admissible during the penalty phase:

> ... In the proceedings on the question of penalty, *evidence* may be presented by both the people and the defendant as to *any* matter relevant to aggravation, mitigation, and sentence, *including, but not limited to,* ... the defendant's character, background, history, mental condition and physical condition.

(Emphasis added). Thus, "[t]he admission of evidence is not limited to matters relevant to the specified aggravating or mitigating factors." [9] *People v. Murtishaw,* 29

---

**9.** As we noted in footnote 1, the case before us arises under California's 1977 capital sentencing statute. In interpreting a different version of § 190.3 under the *1978* statute, the California

Cal. 3d 733, 773, 631 P.2d 446, 470, 175 Cal.Rptr. 738, 762 (1981) (footnote omitted), *cert. denied,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982); *see also Barclay v. Florida,* 463 U.S. 939, 967, 103 S.Ct. 3418, 3433, 77 L.Ed.2d 1134 (1983) (Stevens, J., concurring in judgment) ("the Constitution does not prohibit consideration at the sentencing phase of information not directly related to either statutory aggravating or statutory mitigating factors, as long as that information is relevant to the character of the defendant or the circumstances of the crime") (citing cases). "[T]he jury [i]s free, after considering the listed aggravating and mitigating factors, to consider any other matter it thought relevant to the penalty determination." *Boyd,* 38 Cal.3d at 773, 700 P.2d at 790, 215 Cal.Rptr. at 9. Thus, psychiatric evidence is admissible to show defendant's present "character, background, history, mental condition and physical condition." *Murtishaw,* 29 Cal. 3d at 774 n. 39, 631 P.2d at 470 n. 39, 175 Cal. Rptr. at 762 n. 39.

■ Harris argues that the court's modified instruction permitted the use of mental or physical condition as an aggravating factor "so as to arbitrarily weigh a sentencing decision in favor of death." The court's modified instruction cannot be reasonably so construed.

During the guilt phase of the trial, Harris testified that he had nothing to do with the murders. During the penalty phase, Harris recanted that testimony, and expressly admitted the crimes and stated he was "sorry." He sought to support his claim of remorse by calling Deputy Sheriff Mendoza who testified that when he inquired into Harris' emotional state after he cut his arm in an alleged suicide attempt, Harris appeared to feel remorse for his crimes.

Harris points to the testimony of Dr. Wait Griswold, a psychiatrist who had examined Harris in the early morning hours of July 6, 1978, to demonstrate that the nonstatutory factors of mental and physi-

cal condition were used by the prosecution as aggravating circumstances. Dr. Griswold was called by the prosecution to testify in rebuttal to Harris' claim of remorse. The psychiatrist testified that he was of the opinion that Harris had a personality disorder known as an "antisocial personality" in psychiatric nomenclature.

Antisocial personality is listed as No. 301.70 in *DSM–II: Diagnostic and Statistical Manual of Mental Disorder* (3d ed. 1980) (hereinafter *DSM II* ). This disorder is also known as a "psychopathic" or "sociopathic" personality. This personality disorder is not a neurosis or a psychosis. An individual is not born with this personality disorder; rather, it is a product of the individual's background, upbringing, and environment.

Dr. Griswold testified that an antisocial individual tends to be immature, emotionally unstable, callous, irresponsible, manipulative, impulsive, egotistical, has an inability to profit from past experience or punishment, projects the blame on someone else, and does not feel true remorse for crimes he commits. He stated this type of individual would be able to have the capacity to appreciate the criminality of his actions, the ability to control his actions, and to deliberate and premeditate upon a murder.

The factors the jury was asked to consider concerning the defendant's "character, background, mental condition, and physical condition" were stated neutrally. They were not described as aggravating or mitigating. The jury heard that Harris had a dismal childhood, and the evidence showed that his father had severely beaten Harris when he was an infant. There was also evidence about his minimal education, the conviction of his father for sexually molesting his sister, and his mother's conviction for bank robbery. Under the court's instruction all of the foregoing evidence could be considered in mitigation of the punishment Harris should suffer for his crimes. The Supreme Court has often repeated the principle that "[w]hat is impor-

Supreme Court held the jury can only consider evidence relevant to the specific factors enumerated in § 190.3. *People v. Boyd,* 38 Cal.3d 762, 773–75, 700 P.2d 782, 790–92, 215 Cal.Rptr. 1, 9–11 (1985).

tant at the selection [of punishment] stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. 862, 879, 103 S.Ct. 2733, 2743–44, 77 L.Ed.2d 235 (1983) (emphasis in original) (citing cases). Evidence of a defendant's character, background, history, mental condition and physical condition permit such a determination. The court's instruction impartially informed the jury that it was proper to consider such evidence in selecting the appropriate punishment.

Citing to language in *Zant v. Stephens*, 462 U.S. at 885, 103 S.Ct. at 2747, Harris claims the "trial court permitted appellant's sentencing jury to find as aggravating factors which '... actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness.'" The Supreme Court in *Stephens* cited *Miller v. Florida*, 373 So.2d 882 (Fla.1979) for this proposition.

In *Miller*, after the defendant had been charged with murder, he was found incompetent to stand trial and committed to the state mental hospital. After two and one-half years of confinement and treatment, he was found sufficiently competent to stand trial; his mental illness was in remission through the use of tranquilizing drugs. Testimony was presented at the sentencing hearing that the defendant was suffering from paranoid schizophrenia and hallucinations. He had been committed to mental hospitals on several previous occasions.

The trial judge, during the penalty phase, concluded that "the mental sickness or illness that [defendant] suffers from is such that he will never recover from it, it will only be repressed by the use of drugs." *Id.* at 885. Relying principally on this factor, the judge sentenced defendant to death because this was the "only assurance society can receive that this man never again commits to another human being what he did to that lady...." *Id.*

*Miller* is clearly distinguishable from the circumstances presented in the instant matter. The primary reason that the Florida Supreme Court reversed the sentence of death is that the trial judge relied on a *nonstatutory* aggravating factor. Under Florida law, a trial judge is not permitted to consider a nonstatutory circumstance in selecting the proper penalty. Furthermore, the evidence concerning Harris' "mental condition" is distinguishable from the evidence of psychosis (paranoid schizophrenia) relied upon by the trial judge in *Miller*. Dr. Griswold testified Harris had a personality disorder, i.e., antisocial personality, DSM III 301.70, and expressly distinguished this type of mental disorder from a psychosis or neurosis. A personality disorder is not analogous to "the incurable and dangerous mental illness" of a person diagnosed as suffering from paranoid schizophrenia and hallucinations.

The DSM is prepared by the American Psychiatric Association primarily to identify conditions which members of the Association may diagnose. To a considerable degree, these psychiatrists have determined mental disorders by the morals and conventions of our society. Most dramatically, in *DSM–II*, under the general category of "Personality Disorders and Certain Other Non–Psychiatric Disorders," there was a subcategory "Sexual Deviations," a classification "for individuals whose sexual interests are directed primarily towards objects other than people of the opposite sex ..." *DSM–II* n. 302 (1968). This general definition of sexual deviation as a mental disorder was in conflict with the definition that followed of homosexuality, which was accepted as not in itself a psychiatric disorder and treated as a psychiatric disorder only for those who wished to change their sexual orientation. In *DSM–III* (1980) the general definition of sexual deviation was abandoned and a new definition as supplied of homosexuality as a mental disorder. Only "egodystonic homosexuality," defined as "a desire to acquire heterosexual arousal ... and a sustained pattern of overt sexual arousal that the individual explicitly states has been unwanted," was treated as a mental disorder. *DSM–III*, P. 281. The amendment was clearly a result of changing morals and conventions in the United States.

This interaction between general social attitudes and what seems appropriate for medical diagnosis is suggestive that what is classified as a mental disorder by the American Psychiatric Association is not necessarily a condition that a state is constitutionally required to take into account in assessing punishment. In the case of the condition described as an antisocial personality there is a substantial tension between the implications of its being seen as a "can't help" characteristic and what are the frequent accompaniments of this condition. The disorder, the American Psychiatric Association observes, often leads to "many years of insitutionalization, more commonly penal than medical." *DSM–III*, p. 318. In adulthood those with this condition are marked by a "failure to accept social norms with respect to lawful behavior." *Id.*

*Zant* suggested that "mental illness" might actually militate in favor of a penalty less than death. The "mental disorder" of such antisocial personality is not "mental illness" in the sense used by *Zant.* For the ordinary citizen it would, to say the least, be paradoxical that a person who was likely not to accept social norms with respect to lawful behavior should be treated more kindly than the person who was law-abiding. The paradox is all the stronger when it is the view of the American Psychiatric Association that persons with this condition are capable of understanding the consequences of their actions and are willing to perform or not to perform particular volitional acts. We may go further and say that it is difficult to suppose that there are any persons who commit the kind of vicious crime for which the death penalty is now imposed in this country who do not possess one or more of the personality disorders or one or more of the neuroses recognized as mental disorders by the American Psychiatric Association. To hold that each of these conditions must be a mitigating factor when the death penalty is considered would be to undermine the death penalty under the guise of acknowledging that what the American Psychiatric Association finds to be a mental disorder must be treated as a factor that calls for

less severe punishment than death. We cannot say that the evolving standards of decency that have characterized interpretation of the eighth amendment require a state to conform its scheme of capital punishment to such a norm.

*DSM–II*, which Dr. Griswold relied on during his testimony, lists specified "mental disorders." These disorders include such conditions as anxiety neurosis or "anxious over-concern;" [*DSM–II* § 300.00] obsessive compulsive neurosis or the persistant intrusion of unwanted thoughts, urges, or actions that the patient is unable to stop;" [*DSM–II* § 300.3] neurasthenic neurosis, "characterized by complaints of chronic weakness, easy fatigability and sometimes exhaustion;" [*DSM–II* § 300.5] and a variety of other neuroses such as "writer's cramp." All of these neuroses disturb mental functioning and those suffering the problem are aware that their functioning is disturbed.

In distinction from these neuroses are a group of personality disorders "characterized by deeply ingrained maladaptive patterns of behavior." *DSM–II* § 301. These disorders include an obsessive compulsive personality, otherwise known as anankastic personality, a condition characterized "by excessive concern with conformity and adherence to standards of conscience." *Id.* § 301.4. There is also an "asthenic personality," distinguished from the related neuroses by being a behavior pattern marked by "easy fatigability, low energy level, lack of enthusiasm, marked incapacity for enjoyment, and over-sensitivity to physical and emotional stress." *Id.* § 301.6. The diagnostic category "antisocial personality" is one of these personality disorders. *Id.* § 301.7.

It is a question of first impression whether all or any conditions classified as mental disorders by the American Psychiatric Association must be recognized by a state as a mitigating factor in imposing capital punishment. They are from one point of view "can't helps"—characteristics of an individual that no single act of volition on the individual's part would change. From another point of view, they are characteristics

which to the ordinary lay person are part of an individual's personality or character, and any judgment about personality or character would take them into account.

Considering the specified and unspecified neuroses and the specified types of personality disorders, one is aware that the diagnostic categories of the American Psychiatric Association fit a number of persons who function in American society without treatment and who form part of the general society. An estimate of the prevalence of antisocial personality disorder, made in 1980 after the trial in this case, was that about three percent of American males suffered from it. *DSM–III,* p. 319.

The jury is entitled to consider the character of the defendant during the penalty phase to make an individualized determination of the sentence. *Stephens,* 462 U.S. at 879, 103 S.Ct. at 2744. The defendant properly introduced evidence at the penalty phase that he felt remorse notwithstanding his earlier testimony that he did not commit the homicides. The prosecution was also entitled to rebut this belated recantation and acceptance of responsibility by introducing evidence about Harris' background and personality to his attempt to mitigate his homicidal conduct. "[T]he presence or absence of remorse is a factor relevant to the jury's penalty decision" in a capital case. *People v. Ghent,* 43 Cal.3d 739, 771, 739 P.2d 1250, 1271, 239 Cal.Rptr. 82, 103 (1987). The instruction permitting the jury to consider the defendant's "character, background, history, mental condition, and physical condition" properly narrowed the class of persons eligible for the death penalty who reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Stephens,* 462 U.S. at 877, 103 S.Ct. at 2742. The giving of the modified instruction was not error.

We AFFIRM the order of the district denying the petitions for writ of habeas corpus. We VACATE our stay of execution.